## THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUESETTS

| | |
|---|---|
| VAL KAY, Derivatively on Behalf of Nominal Defendant XL FLEET CORP., <br><br>             Plaintiff, <br> v. <br><br> DEB FRODL, ERIC TECH, KEVIN GRIFFIN, CHRIS HAYES, JOHN LEDECKY, SARA SCLARSIC, JOHN MILLER, H.R BRADY, DIMITRI KAZARINOFF, THOMAS J. HYNES III, AND BRIAN PIERN, <br><br>             Defendants, <br> And <br><br> XL FLEET CORP. <br><br>             Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Val Kay ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant XL Fleet Corp. ("XL Fleet", "XL" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by XL Fleet with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by XL's directors and officers from October 2, 2020 and the present (the "Relevant Period").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

3.      Plaintiff's claims also raise a federal question pertaining to the claims made in the securities class actions entitled *In re XL Fleet Corp. Securities Litigation*, Case No. 1:21-cv-02002-LGS (S.D.N.Y.) (the "Securities Class Action") based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiff**

5.      *Plaintiff Val Kay* purchased shares of XL Fleet stock and continues to hold his XL Fleet stock.

**Nominal Defendant**

6.      *Nominal Defendant XL Fleet* is incorporated under the laws of Delaware with its principal executive offices located in Boston, Massachusetts.

2

**Defendants**

6.      **Defendant Deb Frodl** ("Frodl") serves as XL Fleet Chairman and a member of the Board of Directors ("Board").   Defendant Frodl is also a member of the Audit Committee. Defendant Frodl is also the Chair of the Nominating and Corporate Governance Committee.

7.      **Defendant Eric Tech** ("Tech") is the Chief Executive Officer ("CEO") and a member of the Board.

8.      **Defendant Kevin Griffin** ("Griffin") is a member of XL Fleet's Board.  Defendant Griffin served as a Director of Pivotal prior to the Merger and remains on the post-merger XL Fleet Board.  Defendant Griffin, at all relevant times, was the CEO of MGG Investment Group, LP, an affiliate of Pivotal Spac Funding II LLC (the Sponsor's other managing member, where Griffin was the CEO and a Director).  Also, Griffin was at all relevant times the CEO and Chief Investment Officer of MGG Special Opportunities Fund LP, which purchased Pivotal shares in the PIPE Transaction and is also an affiliate of Pivotal Spac Funding II LLC.  Defendant Griffin was also a Director of Pivotal I and remains in that role following Pivotal I's de-SPAC merger, and is the CEO, President, and a Director of Pivotal III.   Defendant Griffin is a member of the Compensation Committee.

9.      **Defendant Chris Hayes** ("Hayes") is a member of XL Fleet's Board.  Defendant Hayes is the Chairman of the Compensation Committee.  Defendant Hayes is a member of the Nominating and Corporate Governance Committee.

10.      **Defendant John Ledecky** ("Ledecky") is a member of XL Fleet's Board. Defendant Ledecky was the Chairman, and CEO of Pivotal.  Defendant Ledecky remains on XL Fleet's post-merger Board.  Defendant Ledecky is the Chairman of Ironbound Partners Fund, LLC, which was one of the Sponsor's two managing members.  Defendant Ledecky is a prolific SPAC

founder, having launched numerous such entities and raised more than $1 billion dollars since 2005.  Defendant Ledecky was the Chairman and CEO of the first SPAC in his "Pivotal" line, Pivotal Acquisition Corp. ("Pivotal I"), until that Company's deSPAC merger.  Defendant Ledecky is also currently the Chairman of Pivotal Investment Corporation III ("Pivotal III")

11.    **Defendant Sara Sclarsic** ("Sclarsic") served as a member of the Board prior to the Merger and remains on the post-merger XL Fleet Board.  Defendant Sclarsic is a current Director of Pivotal III.  Defendant Sclarsic is also a member of the Audit Committee.

12.    **Defendant John Miller** ("Miller") is a member of XL Fleet's Board.  Defendant Miller is the Chairman of the Audit Committee.  Defendant Miller is a member of the Compensation Committee.  Defendant Miller is a member of the Nominating and Corporate Governance Committee.

13.    Defendants Frodl, Tech, Griffin, Hayes, Ledecky, Sclarsic and Miller are herein referred to as the "Director Defendant".

**<u>Other Defendants</u>**

14.    **Defendant James H.R. Brady** ("Brady") has served as Pivotal's Chief Financial Officer ("CFO") since September 2018.  Brady participated in Merger negotiations, signed the Merger Agreement, signed or authorized the signing or filing of the September 18, 2020 Form 8-K and the attached exhibits, including the September 18, 2020 press release, the October 2, 2020 Registration Statement and the November 12, 2020 and December 1, 2020 amendments thereto, and the related December 8, 2020 Proxy/Prospectus.  Since 2014, Defendant Brady was the CEO of Brady Enterprises, which provides financial, legal and strategic services to growth companies

15.    **Defendant Dimitri Kazarinoff** ("Kazarinoff") was the Chief Executive Officer ("CEO") of XL Hybrids and became CEO of XL Fleet following the Merger.

16.     **Defendant Thomas J. Hynes III** ("Hynes") is the current President of XL Fleet and was, at the time the Merger was being negotiated, the founder and Chief Strategy Officer of Legacy XL.  Prior to the merger, Defendant Ledecky had a "decades long relationship" with Defendant Hynes's family, and Defendants Ledecky and Hynes had been "business acquaintances" for ten (10) years.

17.     **Defendant Brian Piern** ("Piern") was XL's Vice President of Sales and Marketing from January 2019 through May 2021. During his time at XL, Piern initially reported to Hynes and later reported to Kazarinoff. Prior to Piern's employment at XL, he served as Senior Vice President of Sales at Element Fleet Management from September 2015 to December 2018.

18.     Defendants Ledecky, Brady, and Griffin are referred to herein, collectively, as the "Pivotal Individual Defendants."

19.     Defendants Hynes, Kazarinoff and Piern are referred to herein, collectively, as the "XL Individual Defendants."

20.     The Director Defendants, the Pivotal Individual Defendants and the XL Individual Defendants are collectively referred to herein as the "Individual Defendants". The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## THE AUDIT COMMITTEE CHARTER

21. The purpose of the Audit Committee is to assist the Board in its oversight of the quality and integrity of XL Fleet's financial statements, XL Fleet's compliance with legal and regulatory requirements, and the qualifications, performance and independence of the external auditors.

22. The Audit Committee Charter provides:

**RESPONSIBILITIES**

The Committee shall have the following responsibilities; provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and stock exchange listing requirements.

*Financial Review and Disclosure*:

1. **Annual Audit Results**. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

• the Auditors' assessment of the quality of the Company's accounting principles and practices;

• the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);

• all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

• the adequacy of the disclosures in the financial statements; and

• any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

2. **Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the

proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

## CORPORATE GOVERNANCE GUIDELINES

23.     The Company's Corporate Governance Guidelines provide:

**XL FLEET CORP.**

**CORPORATE GOVERNANCE GUIDELINES**

The Board of Directors (the "Board") of XL Fleet Corp. (the "Company"), which is elected by the stockholders, is the ultimate decision-making body of the Company, except with respect to matters reserved to the stockholders. The Board has adopted the following Corporate Governance Guidelines (the "Guidelines") to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders. The Guidelines should be applied in a manner consistent with all applicable laws and stock exchange rules and the Company's charter and bylaws, each as amended and in effect from time to time. The Guidelines are generally intended to serve as a flexible framework for the conduct of the Board's business and not as a set of legally binding obligations; consequently, the Board may exercise its judgment in conducting its business and shall not be bound by these Guidelines, other than with respect to matters that are required by applicable law or regulation. In addition, the Board may modify or make exceptions to the Guidelines from time to time in its discretion and consistent with its duties and responsibilities to the Company and its stockholders.

***

**B.      Director Responsibilities**

The principal responsibility of the directors is to oversee the management of the Company and, in so doing, to exercise their business judgment to act in a manner which they reasonably believe to be in the best interests of the Company and its stockholders. This responsibility includes:

•       Evaluating the performance of the Company and reviewing and approving fundamental operating, financial and other corporate plans, strategies and objectives.
•       Selecting and evaluating the performance of the Chief Executive Officer ("CEO") and developing policies and principles for CEO selection and performance review, as well as policies regarding CEO succession.
•       Reviewing the Company's policies and practices with respect to risk assessment and risk management.
•       Providing advice and assistance to the CEO and other senior executives of the Company.

- Evaluating the overall effectiveness of the Board and its committees.
- Establishing the form and amount of compensation for Directors. Directors are expected (i) to regularly attend all meetings of the Board and all meetings of committees on which they serve and (ii) to prepare for all meetings and to review the materials that are sent out in advance of those meetings.

Directors are also expected to spend the necessary time to discharge their responsibilities appropriately and to ensure that other existing or future commitments do not materially interfere with their responsibilities as members of the Board.

## SUBSTANTIVE ALLEGATIONS

### A.    Special Purpose Acquisition Companies ("SPAC")

24.    A "blank check company" is a company that has no specific established business plan or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person.  One type of blank check company is a special purpose acquisition company, or SPAC.

25.    A SPAC is a publicly-traded company created specifically to pool funds through an initial public offering for the purpose of completing an acquisition or other business combination with an existing company.

26.    In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-market the investment offering to interested investors.  A target company cannot be identified before the SPAC initial public offering is completed.  Once capital is raised through the initial public offering, the proceeds must be deposited into a trust account. An appointed management team then has a specified time period to identify an appropriate target to complete the merger or acquisition.

27.     Common stockholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team.   When the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination.   Stockholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions.

28.     A SPAC shareholder may vote for or against a proposed business combination.  A SPAC shareholder may decide to retain ownership of his or her SPAC shares, may request that the SPAC redeem their shares for his or her proportionate interest in the SPAC's trust funds, or may sell his or her shares on the open market.

29.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities.  However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC is automatically dissolved and the money held in trust is returned back to investors.  No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.

30.     The founders and management team of a SPAC, who typically own 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to complete a qualifying transaction approved within the operating deadline.

31.     Numerous commentators have noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For

instance, in a paper forthcoming in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate."[1]  Based on empirical research of post-merger returns to SPAC shareholders, that paper goes on to conclude that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

32.     As set forth herein, Pivotal and XL Fleet exemplify the inherent conflicts with SPACs.  Defendants were incentivized to persuade public investors to consummate the Business Combination between Pivotal and XL Fleet that was not in investors' best interests, by making material misstatements and omissions about XL Hybrids' business.

**B.    Background Of Pivotal**

33.     Pivotal was a blank check company organized for the purpose of effecting a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business combination with one or more businesses or entities.  Pivotal's Sponsor was Pivotal Investment, whose members are Ironbound Partners, an affiliate of Ledecky, and Pivotal Spac Funding II LLC, an affiliate of Griffin.

34.     Pivotal was led by its Chairman and CEO, Ledecky, a seasoned businessman with over 35 years of investment and operational experience.  Ledecky had executed hundreds of acquisitions across multiple industries, including through several other blank check companies, and raised over $20 billion in debt and equity.

---

[1]      Klausner, Michael D. and Ohlrogge, Michael and Ruan, Emily, A Sober Look at SPACs (Oct. 28, 2020) Yale Journal on Regulation, Forthcoming, available at: https://ssrn.com/abstract=3720919.

35.     Griffin served as a director of Pivotal.  Griffin also served as the CEO of Pivotal Spac Funding II LLC, one of the members of the Sponsor.  Griffin was also the CEO and CIO of MGG Investment Group, LP, a private investment firm managing long-term committed capital on behalf of leading endowment, foundation, pension, insurance and high net worth investors globally.  Over the course of Griffin's career, he originated and invested over $4 billion across the capital structure of middle market businesses and served on numerous boards of directors.

36.     Pivotal was incorporated on March 20, 2019 and on April 25, 2019 it filed a Draft Registration Statement with the SEC.  The Registration Statement for its Class A common stock and warrants was filed with the SEC on Form S-1 on June 7, 2019, and on July 11, 2019, it was declared effective.  On July 15, 2019, Pivotal's final Prospectus (the "July 2019 Prospectus") was filed with the SEC, and on July 16, 2019, Pivotal completed its IPO.

37.     Pivotal stated in its July 2019 Prospectus:

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies in North America in industries ripe for disruption from continuously evolving digital technology and the resulting shift in distribution patterns and consumer purchase behavior. Most of these middle market and emerging growth companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability.   We believe that acquiring a leading, high-growth participant will provide a public currency to fund consolidation and fuel growth. Segments we might explore include, but are not limited to, logistics technology and "last mile" delivery services, business technology services, online cyber security and off-line physical security services, media and entertainment services and franchise businesses.

38.     The July 2019 Prospectus further stated: "[w]hile we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on companies exploiting disruptive smart phone technology and the resultant rapidly changing distribution patterns and evolving consumer purchase behavior."

39.     Pivotal's July 2019 Prospectus claimed: "we possess several competitive strengths to successfully source, evaluate and execute an initial business combination. We believe that the background, operating history and experience of our management team and special advisors have equipped us not only to provide access to a broad spectrum of investment opportunities, but also to significantly improve upon the operational and financial performance of a target business." It also stated that "[w]e intend to maximize our potential target investments by proactively approaching our extensive network of contacts, including private equity and venture capital sponsors, executives of public and private companies, merger and acquisition advisory firms, investment banks, capital markets desks, lenders and other financial intermediaries. We believe the prior investment experience and track record of our team will give us a competitive advantage when sourcing potential initial business combination opportunities."

40.     As detailed in the July 2019 Prospectus, while Pivotal had considerable discretion in identifying and consummating a business combination, there were three general limitations:

- As required by NYSE rules, Pivotal had to complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (net of amounts previously disbursed to management for tax obligations and excluding the amount of deferred underwriting discounts held in trust) at the time of its signing a definitive agreement in connection with its initial business combination.  Pivotal stated in its April 25, 2019 Draft Registration Statement that if its board of directors was not able to independently determine the fair market value of the initial business combination, it would obtain an opinion from an independent investment banking firm, or another valuation or appraisal firm that commonly renders fairness opinions with respect to the satisfaction of such criteria.

- Pivotal had only eighteen months to complete a business combination from the closing date of the IPO.  If Pivotal did not complete a business combination in time (by January 16, 2021), its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, Pivotal was required to hold the approximately $230 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

- If Pivotal's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of Pivotal's obligation to redeem 100% of the public shares if Pivotal did not complete a business combination on time, Pivotal was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

C.    **Pivotal's January 16, 2021 Deadline**

41.    Due to the Pivotal Individual Defendants' ownership interests in Pivotal and the terms and financial structure of Pivotal as a SPAC, the Pivotal Individual Defendants possessed strong financial incentives to complete a qualifying transaction by the January 16, 2021 deadline. As that deadline grew nearer, the Pivotal Individual Defendants faced pressure to complete a transaction, irrespective of the merits of that transaction for Pivotal's public shareholders.

42.    Pivotal's Sponsor, Pivotal Investment, owned 95.7% of Pivotal's initial shares.  The members of Pivotal Investment were Ironbound Partners, an entity affiliated with and controlled by Ledecky, and Pivotal Spac Funding II LLC, an entity affiliated with and controlled by Griffin. Ledecky and Griffin, therefore, were the ultimate owners of Pivotal's initial shares held by Pivotal Investment.  Brady owned 1.7% of Pivotal's initial shares and the Pivotal Directors, excluding

Ledecky and Griffin, each owned less than 1% of Pivotal's initial shares. Following Pivotal's IPO, Pivotal Investment would own approximately 19% of Pivotal's shares, and Brady and the Pivotal Directors, excluding Ledecky and Griffin, would collectively own approximately 1% of Pivotal shares.

43.     If a Business Combination was not consummated by January 16, 2021 (or a later date if approved by Pivotal's stockholders), Pivotal would cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. In such event, the 5,750,000 shares held by the Sponsor and Pivotal's directors and officers, which were acquired for an aggregate purchase price of $25,000 prior to Pivotal's initial public offering, would be worthless because the holders were not entitled to participate in any redemption or distribution with respect to such shares.

44.     As the January 16, 2021 deadline drew closer, the pressure on the Pivotal Individual Defendants to complete a qualifying business combination increased. Between Pivotal's July 16, 2019 IPO and September 17, 2020, Pivotal identified and met with various potential target businesses to discuss a possible business combination, yet none of these discussions resulted in an executed letter of intent. From July 16, 2019 IPO through at least March 30, 2020, Pivotal stated in multiple SEC filings: "we intend to focus our search on companies exploiting disruptive smart phone technology."[2]

### D.     Pivotal Announces Merger Agreement With XL Fleet

45.     On September 18, 2020, Pivotal and XL Fleet jointly announced that they had entered into a merger agreement, subject to approval by Pivotal's and XL Fleet's stockholders (the

---

[2]     Pivotal Form S-1 filed June 7, 2019 at 66; Pivotal IPO Prospectus filed July 15, 2019 at 66; Pivotal Form 10-K filed Mar. 30, 2020 at 1.

"Merger Agreement").   According to the press release, the merged entity would have "an anticipated implied enterprise value of approximately $1 billion and no material debt expected to be outstanding."

46.     Also, on September 18, 2020, Pivotal filed with the SEC a Form 8-K that contained further information about the proposed merger transaction.  The Form 8-K included, a copy of the September 18, 2020 press release, a copy of the Merger Agreement, and an investor presentation (the "Investor Presentation") that contained additional representations about XL Fleet's business.

47.     Through these various channels, Defendants touted XL Fleet's growth potential, pipeline, supply chain production capacity, and overall prospects.  For instance, the September 18, 2020 press release stated that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." The press release also provided that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University." The Investor Presentation provided that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."   The Investor Presentation also provided that the XL hybrid product could "[i]mprove MPG (~25%)," and that XL plug-in was "capable of driving up to 50% savings in MPG."

48.     As detailed herein, these statements by Defendants were false and misleading because they failed to disclose that (i) XL Fleet had manipulated and overstated its pipeline figures, (ii) XL Fleet had been experiencing supply chain problems that impeded its ability to timely fill existing orders, (iii) a large number of the customers touted by XL Fleet were inactive and no

longer ordering XL Fleet products, (iv) the quality and benefits of XL Fleet's technology were overstated and that technology did not provide the miles-per gallon savings to customers that XL Fleet represented, and (v) as a result of these omissions, Defendants' rosy assessment of XL Fleet's prospects and projections of future revenue were wildly overstated.

### 1. *XL Hybrids*

49.     XL Hybrids was founded in 2009 by its President and Chief Strategy Officer, Tod Hynes, and is a provider of fleet electrification solutions for Class 2-6 commercial vehicles in North America.[3]  Hynes and XL Hybrids' CEO, Dimitri Kazarinoff, claimed to have decades of leading energy innovation, automotive, and electric vehicle ("EV") experience.  XL Hybrids claimed that since its founding, it had deployed its hybrid and plugin hybrid electric drive systems on thousands of vehicles across hundreds of fleets throughout the United States and Canada.

50.     XL Hybrids claimed to be a trusted brand for over 200 of the largest commercial and municipal fleets in North America, with more than 3,200 XL systems deployed and over 130 million miles driven by customers as of December 8, 2020.  XL Hybrids claimed that its customer base included FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University, among other blue-chip companies, municipalities, and institutions.

51.     A September 18, 2020 press release announcing the Merger Agreement asserted that XL Hybrids had "developed a flexible proprietary electrification powertrain platform that transforms traditional fossil fuel-powered fleet vehicles into hybrid and plug-in hybrid electric vehicles as they are manufactured.  XL Fleet systems are available on a wide variety of Class 2-6

---

[3]     Class 2-6 vehicles include vehicles generally classified as light duty (less than 10,000 pounds) and medium duty (between 10,000 pounds and 26,000 pounds) under the gross vehicle weight rating system, such as utility vans, pick-up trucks, mini-bus, box trucks.

vehicles manufactured by Ford, Chevrolet, GMC, and Isuzu, and the Company is on track to provide its systems in Class 7-8 vehicles in 2022."[4]

52.    The September 18, 2020 press release stated that in addition to XL's electric powertrain platform, "XL provides real-time data monitoring and analytics, and will expand its 'Electrification-as-a Service' solution, which includes power management, charging infrastructure, and onsite power and storage offerings. XL is also developing all electric offerings. The Company's rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion, which incorporates the money spent on energy consumption and vehicle costs for commercial fleets globally."

### 2.    *Inflated Sales Pipeline And Revenue Projections*

53.    Since at least 2019, XL Fleet had been regularly recording losses, and by the middle of  2020, XL Fleet was experiencing a serious cash shortage and needed outside funds to continue as a going concern.  The XL Fleet Individual Defendants had a strong incentive to exaggerate XL Fleet's sales pipeline and revenue projections in order to obtain additional financing or to present XL Fleet as an attractive target for a potential acquirer.

54.    As Pivotal acknowledged in its December 8, 2020 proxy statement and prospectus, at the time the Merger Agreement was executed, XL Fleet had a substantial working capital deficit, it was not generating profits and expected to continue to incur net losses, and substantial doubt existed about XL Fleet's ability to continue as a going concern:

> As of September 30, 2020, XL had a working capital deficit of $27.6 million and an accumulated deficit of $87.6 million. XL incurred a net loss of $20.0 million for the nine months ended September 30, 2020 and a net loss of $14.9 million for the year ended December 31, 2019.

---

[4]    Class 7-8 vehicles are heavier trucks between 26,001 and 33,000 pounds, and over 33,000 pounds, respectively, and usually have three axles or more, such as refuse vehicles, city transit buses, tractor trailers, and fire trucks.

XL expects to continue to incur net losses in the short term .... XL's ability to access capital when needed is not assured and, if capital is not available when, and in the amounts needed, it could be required to delay, scale back or abandon some or all of its development programs and other operations, which could materially harm XL's business, prospects, financial condition and operating results. Because of this uncertainty, there is substantial doubt about XL's ability to continue as a going concern ....

While management believes the funds to be raised in the Business Combination will alleviate the conditions that raise substantial doubt, it is not expected that such doubt can be alleviated prior to the consummation of the Business Combination.

55.     According to a Former Employer of XL Fleet ("FE1")[5], XL Fleet was always looking for investors and trying to raise money during her tenure at the Company (May 2019 through June 2020).  According to FE2, when she was hired at XL Hybrids (in or around June 2020), she was informed that the company had enough financing to last until the end of 2020.  FE2 stated that she was aware that XL Fleet was seeking further financing and needed such financing to continue operations.

### 3.     XL Fleet's Pipeline Inflation Scheme

56.     Even before Pivotal had identified XL Fleet as an acquisition target and started discussions concerning a potential merger in or around July 2020, XL Fleet engaged in practices that caused its sales pipeline figures and revenue projections to be materially overstated.

57.     XL Fleet's pipeline figures and revenue projections were based on data collected by its sales team and entered into the Salesforce software system, a system for tracking sales opportunities with existing and potential customers.  As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020:

XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles.  This is used by XL management to create projections about

---

[5]     All references to former employees are found in the securities class action entitled *In re XL Fleet Corp. Securities Litigation*, Case 1:21-cv-02002-LGS (S.D.N.Y.), pending in the Southern District of New York.  All references to the former employees (FEs) of XL Fleet are based on information and belief.

future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections.

58.     As set forth by several former employees found in the Securities Class Action complaint, XL Fleet manipulated the data in the Salesforce system in a variety of ways, causing the Company's reported pipeline figures to be materially overstated.  During a period that extended from at least Q4 2019 through Q3 2020, Defendant Piern, XL Fleet's Vice President of Sales and Marketing, would regularly instruct employees to (i) enter sales opportunities for particular customers in the Salesforce system without a reasonable basis, (ii) record inflated percentage likelihoods of sales, and (iii) maintain pre-existing entries in the Salesforce system after customers indicated that they would not be ordering products in the amounts recorded in Salesforce (or at all).  Further, Piern would frequently override and alter entries in the Salesforce system made by sales personnel to inflate the percentage likelihood of a sale.

59.     For instance, according to FE1, in November 2019, FE1 and Piern attended a National Association of Pupil Transportation conference.  At this conference, FE1 and Piern spoke with five or six original equipment manufacturers ("OEMs") of school buses.  These conversations were general in nature and not detailed enough to expect the OEMs to place orders with XL Hybrids.  Nonetheless, Piern instructed FE1 to enter a five percent sales opportunity into XL's Salesforce.com sales tracking software for 100 units (equivalent to approximately $1.6 million in potential sales) for each of these OEMS, totaling 500-600 units (equivalent to approximately $8.0 $9.6 million in potential sales).

60.     As another example, at a weekly sales meeting, Piern instructed FE1 to identify large commercial fleets and enter those as sales opportunities even if FE1 had not spoken to anyone

at those companies.  Piern gave FE1 such instructions irrespective of whether or not the companies

in question even had vehicles that were compatible with XL Hybrids' products.

61.     According to FE1, all the sales opportunities entered into the Salesforce.com

software became part of XL Hybrids' sales pipeline.

62.     FE1 also recalled an instance in which one of XL Fleet's customers, Pepsi, after

purchasing 10 units as a trial run, communicated to XL Fleet that it would not be ordering

additional XL Fleet products.  FE1 stated that Piern knew that Pepsi had no intention of making

any additional purchases.  After a meeting with Pepsi in which FE1 was informed that Pepsi would

not be buying any additional XL Fleet products, FE1 updated XL Fleet's Salesforce.com software

to note this information, and to reflect a zero percent chance of Pepsi ordering additional products.

FE1 later saw that the Salesforce data had been changed to reflect a sales opportunity with a five

percent likelihood for Pepsi.  FE1 stated that Piern often changed the percentages associated with

possible sales that had been entered by sales people in XL Fleet's Salesforce software.  In the

experience of FE1, Piern's changes always reflected an increased likelihood of completing a sale.

63.     FE2[6] also recounted a moment in which Piern directed the artificial maintenance of

a sales probability in Salesforce even after information received from a customer indicated that the

sales probability lacked a reasonable basis.  For example, in the third quarter of 2020, an individual

employed by a potential customer in the elevator industry informed FE2 that the elevator company

might be interested in purchasing 400 units of XL Fleet products (representing approximately $6

---

[6]     Former Employee 2 ("FE2") was XL Fleet's Channel Partner Manager for fleet management
companies from June 2020 until February 2021.  FE2 was the first person to hold this position at XL Fleet
and reported to Piern.  During the time FE2 worked at XL Fleet, Piern reported to Kazarinoff.  Fleet
management companies ("FMCs") help companies manage commercial vehicle fleets for various
companies, such as Amazon.  FE2 described FMCs as a "cottage industry" with a small group of key
players, which handle maintenance, routing and even housing the fleet in a warehouse.  FE2 had contacts
in the FMC industry through FE2's previous work experience and was tasked with identifying potential XL
customers and using FE2's contacts to pitch XL Fleet products to those end-user customers.

million in sales).  FE2 entered this sales opportunity into Salesforce.com for 2021 with a 75%

probability.  However, FE2's contact then left the elevator company, and it became clear to FE2

from ongoing conversations that any purchase from the elevator company would be spread out

over a multiple year period, as the company had a five-year plan to achieve certain sustainability

goals.  As such, FE2 informed Piern before the end of 2020 that this opportunity should no longer

be reflected in Salesforce as a 75% probability of a 400 unit purchase in 2021.  Nonetheless, Piern

told FE2 to maintain this sales opportunity as a 75% probability in Salesforce.

64.  According to FE2, one practice used to increase XL's pipeline figure was the

transmission of pricing information to potential customers.  FE2 stated that if pricing was sent to

a potential customer, the sales opportunity was increased from 5% to 25% in Salesforce, even if

the potential customer did not indicate a lot of interest.  Therefore, FE2 would often send quotes

to potential customers to increase the reported probability of a sale in Salesforce.

65.  FE2 recalled that the sales pipeline was approximately $220 million during her time

at XL Fleet (between June 2020 and February 2021).  FE2 stated the sales pipeline was a weighted

average of all the opportunities, based on the assigned percentages in Salesforce.  FE2 believed

that the sales pipeline was overstated.

66.  The *Muddy Waters Report* provides additional accounts of former employees that

further corroborate XL Fleet's pipeline inflation practices.  According to the *Muddy Waters

Report*, Former XL Fleet Employee A stated: "I was paid to lie.  I was paid to falsify and exaggerate

my pipeline."  The same employee also stated:

> Once a quarter before board meetings, I would find that a bunch of my deals with
> larger [potential sales] numbers behind them would have been exaggerated
> substantially in their probability to close: from 25% up to 75%.  For that brief week
> when the board was in town, my deals were at 75%, and I would have nothing to
> do with that. That was [manager name redacted].  A minimum of four times a year
> he would exaggerate my pipeline substantially to report to the board.

*See Muddy Waters Report* at 8.

67.    As mentioned above, FE3[7] confirmed that she was the individual identified as Employee A in the *Muddy Waters Report*, and that the statements attributed to her are correct and accurate.  FE3 also stated that Piern often increased the percentages entered into Salesforce and sometimes made up "bogus" companies and entered opportunities for those companies.  Further, FE3 said Piern had her enter sales opportunities for companies in California, which were all false because XL Fleet could not sell in California because it had lost CARB (California Air Resources Board) approval.[8]

68.    According to the Muddy Waters Report, Former XL Fleet Employee B stated: "Even if [potential customers] have no interest, my boss tells me to go into Sales force and create an opportunity for 100 chassis with hybrid systems in it ... You're talking another $1 million or $2 million that goes into the pipeline that's really not there."

69.    According to the *Muddy Waters Report*, Former XL Employee C stated: "I was told to [exaggerate my pipeline], but I didn't do it.  That was, yes, it wasn't that good for me." According to the *Muddy Waters Report*, Former XL Fleet Employee C was subsequently laid off.

### 4.    *Supply Chain Problems*

70.    One of the key components of XL Fleet's hybrid electric vehicle and plug-in hybrid electric vehicle products is a lithium ion battery pack.  According to FE1, XL Fleet's products

---

[7]    Former Employee 3 ("FE3") was an XL Fleet Regional Sales Manager from November 2018 until June 2020.  FE3 had had weekly one-on-one meetings with Piern.  According to the Securities Class Action, FE3 confirmed that FE3 is the Former Employee A referenced in the *Muddy Waters Report*, and that statements attributed to FE3 as Former Employee A in the *Muddy Waters Report* are correct and accurate.

[8]    In its March 8, 2021 response to the *Muddy Waters Report*, XL Fleet admitted: "In fact, while XL Fleet did lose CARB approval status in 2019 and was unable to secure re-approval in 2020 due in part to the COVID-19 pandemic, the Company expects to receive CARB re-approval in 2021."

could not be shipped to customers unless they included batteries, because without batteries the products would be incomplete and the customers would not pay for them.

71.     During the first week that FE1 worked at XL Hybrids in May 2019, she traveled to Boston for a sales team meeting, at which Piern informed the sales team that XL Hybrids was having issues getting batteries from its supplier LG.  Then-CEO Hynes was present at this meeting.

72.     According to FE1, during her tenure at XL Hybrids (May 2019 to June 2020), XL Hybrids did not make its own batteries, but contracted with third-party supplier LG to provide them.  FE1 explained that the same batteries used by XL Hybrids were used by Chrysler for its Pacifica hybrid electric minivan, and that LG viewed supplying Chrysler as a priority over XL Hybrids.  During FE1's tenure, XL Hybrids could sometimes obtain one or two batteries at a time from LG, but was only able to obtain a minimal amount of batteries.

73.     According to FE1, battery supply was essential to XL Hybrids' ability to make sales, and customers who had placed purchase orders but not received them due to XL Hybrids' delays in obtaining batteries were hesitant to make additional purchases from XL Hybrids.

74.     According to FE4[9], when she was hired in May 2019, she specifically asked about the supply chain and how well it operated.  FE4 was concerned that since XL Fleet was a "small fish," it might not be able to get the components it needed to build the product. She was assured that the supply chain was not an issue. By September 2019, however, she was informed that the company was having challenges obtaining batteries because a larger company was taking priority. FE4 said LG was XL Fleet's battery supplier.  FE4 stated that XL could not fulfill purchase orders without batteries and that she would inform affected customers that there would be delays and

---

[9]     According to the Securities Class Action complaint, Former Employee 4 ("FE4") was an XL Regional Sales Manager from July 2019 until March 2020. She reported to Piern.  FE4 was initially a Regional Sales Manager for the East Coast but later her region changed to Southeast.

tried to provide approximate timeframes for when the orders would be fulfilled. FE4 stated that the supply chain issue impacted her ability to meet her sales quota. According to FE4, XL's difficulty in obtaining batteries continued at least until the time she left the company in March 2020.

75.     According to FE2, during her tenure at XL Fleet (June 2020 to February 2021), XL Fleet continued to have problems obtaining parts which led to backlogged orders not being delivered. FE2 recalled difficulties obtaining batteries and hearing that XL Fleet's battery supplier had informed XL Fleet that larger customers ordering more batteries were a priority over XL Fleet.

76.     The accounts of former employees in the *Muddy Waters Report* further corroborates the existence of serious supply chain problems. As detailed in the *Muddy Waters Report*, Former Employee A stated: "All of 2019 there were essentially zero batteries delivered. In the first six months of 2020, they got line of sight on maybe 90 ... to the point where as soon as they got them, they would go to the most pissed off customer: 'Okay, you can have five batteries.'"

77.     According to the *Muddy Waters Report*, Former Employee B stated:

When I started, they were using LG batteries in all their stuff. Chrysler took all the allocation for all their batteries. They were testing and retesting and trying to validate … by the time I left, they still didn't have a decent supply chain of the battery to get it going where it was. The whole time I was there, they didn't have a battery.

78.     According to the *Muddy Waters Report*, Former XL Employee C stated:

Deliveries weren't happening ... It's like, 'Can you tell me the truth, so I can get my fleets in order?' ... It caused angst with me, because I think that there were some things in the supply chain that they [management] just really knew ... 'Oh, just let them know it'll be 30 days.' Then 30 days passes. 'Well, let them know it'll be another 30 days.'

79.     Due to these supply chain problems, XL Fleet's backlog of orders remained stagnant and did not efficiently convert into revenue. According to FE1, XL Hybrids' order

backlog remained at roughly similar levels during her tenure, without old orders shipping, and without new orders coming in.  As such, FE1 believed that order backlog was not an accurate representation of XL Hybrids' actual capability to generate future revenue.  While Defendants did not report a backlog figure in their public statements on September 18, 2020, Defendants subsequently did report a backlog figure in multiple public statements between October 2, 2020 and January 22, 2021, and touted this figure as an indicator that XL's future revenues were likely to be robust.

80.     Independent of the role that XL Fleet's backlog played as a stand-alone metric that was misleading to investors as an economic indicator in its own right, XL Fleet's backlog also was factored into Defendants' revenue forecast, and Defendants' failure to disclose XL Fleet's ongoing supply chain problems rendered that forecast materially misleading.  Indeed, Defendants' forecast of $75 million in revenue for 2021 assumed both a massive increase in new orders being placed and an even greater increase in both new and old orders being filled.  That forecast was incredibly unrealistic in light of the persistent supply chain difficulties that XL Fleet faced in satisfying a much smaller volume of orders.

### 5.     *XL Fleet's Low Reorder Rates*

81.     Although Defendants portrayed XL Hybrids as a "[t]rusted brand helping fleets drive decarbonization today," and specifically identified 33 high profile customers by name in the investor presentation published on September 18, 2020, many of these customers had ceased doing business with XL Fleet.

82.     According to the Securities Class Action complaint, FE1 confirmed that certain companies touted as customers in Defendants' statements were no longer active customers and did not intend to purchase additional XL Fleet products.  FE1 stated that two of her customers (Pepsi

and Safelite) had only purchased 10 units as a trial run to verify performance, and that both companies had communicated to XL Hybrids that they would make no further purchases, and that FE1's supervisor Piern knew these customers had no intention of making further purchases.

83.     FE2 similarly confirmed that many of the purported customers identified in XL Fleet's investor presentation had not ordered products from XL Fleet in several years.  FE2 stated that Comcast, Verizon, AT&T, UPS and FedEx had not ordered XL products in approximately seven years, and that they would not be ordering XL Fleet's hybrid products in the future because they were planning to purchase fully electric vehicles instead.

84.     The *Muddy Waters Report* confirmed that XL Fleet's customers had low reorder rates and many of the XL Fleet customers touted in the September 18, 2020 investor presentation were inactive.

85.     The *Muddy Waters Report* quoted "Former XL Employee A" as stating "Almost no one reorders . . . it's maybe 10%."

86.     Based on interviews with three former XL Fleet employees, the *Muddy Waters Report* reported that 18 of 33 advertised "customers" had not ordered any XL Fleet products over at least 2019 through the first half of 2020.  These inactive customers included: Alabama Power, DHL, Ferguson, Clark Public Utilities, CalVans, Southern California Edison, SDGE, Portland General Electric, Coca-Cola, Verizon, ThyssenKrupp, Stanley Black & Decker, ComEd, Hawaiian Electric, Safelite, City of Seattle, DTE Energy, and Pepsi.

87.     The *Muddy Waters Report* quoted former XL Fleet employees and a former XL customer discussing specific purported "customers" that had only purchased XL Fleet products for small pilot programs and never made follow-up purchases.  For instance, the Muddy Waters Report

quoted one such source as saying regarding Ferguson, "Just a pilot, two or three trucks; they haven't repeated the order and it's been three to four years."

### 6.    *XL Fleet's Technology Was Overstated*

88.    Although the Defendants publicly promoted supposedly impressive mileage gains and return on investment to customers using XL Hybrids' products, in reality XL Hybrids' customers often experienced minimal mileage gains and negative returns on their investments.

89.    According to the Securities Class Action complaint, FE2 stated that she sold zero products during her tenure with the Company, due in substantial part to the fact that XL Fleet products were too expensive, such that the return on investment was not enough to make the cost worthwhile for potential customers.   According to FE1, some XL Hybrids customers complained that their vehicles' realized miles per gallon of fuel decreased after purchasing XL Hybrids products.

90.    FE4 explained that for some customers, XL Fleet products did not make sense. For instance, customers in rural areas might not see a return on investment.   FE4 stated that fleet managers would not purchase products unless they would receive a return on investment, meaning that the purchase has to result in overall cost savings for the fleet.   Some customers to whom FE4 tried to sell additional XL Fleet products were not interested because they did not obtain sufficient ROI on their prior purchases from XL Fleet, and XL Fleet had increased its product prices thus making customers' expected ROI on new purchases even lower.

91.    FE1 questioned some of the assumptions underlying the return on investment example calculations presented by Defendants to investors (and reproduced in Pivotal's SEC filings).   FE1 noted that the assumed $3.00 per gallon of gasoline was high for most areas of the country at the time.   FE1 also believed that the "Driver Productivity Savings" metric used in XL

Fleet's ROI example calculation was useless and just an effort to make XL Fleet's marketing look appealing.

92.     According to FE2, the ROI information provided in the Seattle case study referenced in XL Hybrids' investor presentations (and reproduced in Pivotal's SEC filings) does not seem accurate, and FE2 could not figure out how the company arrived at the numbers presented in that case study.  FE2 explained that the customer that was the subject of that case study had received a substantial volume discount, and that the fuel cost assumptions used seemed high.  FE2 did not trust the numbers from XL Fleet about product performance, and so FE2 calculated her own numbers when presenting to potential customers.

93.     The *Muddy Waters Report* likewise confirmed that benefits of XL Fleet's technology were overstated and that its technology did not provide the MPG savings or ROI to XL Fleet's customers that XL Fleet publicly represented.

94.     The *Muddy Waters Report* quoted "Former XL Employee A" regarding XL Fleet's MPG and ROI claims, who stated "[t]heir numbers are based upon a bare-boned F-150 on a dyno [dynamometer] in optimal, optimal circumstances, but the second you add weight or a passenger or human error to that, it all goes out the window."  Regarding XL Fleet's claims of up to 50% MPG improvement from its plug-in product, the *Muddy Waters Report* quoted "Former XL Employee A" as stating: "Never would you come across 50% on the plug-in ... The 50%, it's insane that it's advertised ... You might see a decrease in MPG because you're adding 800 pounds of batteries to  the back of an F-150 and expecting it to achieve performance."  The Muddy Waters Report further quoted "Former XL Employee A" regarding her interactions with customers:

> You do have fleet managers that are very savvy and they check their fuel spending. It's the guys that don't care about the PR, they care about performance.

Those guys would be calling me daily being like, 'Dude, this thing's broken down. I'm not seeing any improvement, if anything maybe 1% to 2% per $25,000.' There's no return on investment, zero.

95.    The *Muddy Waters Report* quoted multiple former XL Fleet employees as stating that XL Fleet's publicly touted MPG gains were based on optimal conditions, and that real-world use of XL Fleet's products resulted in dramatically lower MPG gains.  For instance, although XL advertised up to 50% MPG savings for its plug-in product, a former employee stated that average MPG gains for this product were only 25-35%.  And while XL advertised approximate MPG improvement of 25% for its hybrid product, another former employee stated that outside of an optimal city drive cycle MPG savings for this product were probably only 5-10%.

96.    The *Muddy Waters Report* identified specific former XL Fleet customers that had experienced poor ROI and had ceased ordering XL Fleet products, such as Portland General Electric, Pepsi, and Alabama Power.  The *Muddy Waters Report* also quoted former XL Fleet employees as stating that a lot of customers complained about poor results, lack of return on investment, and failure to meet expectations.  The *Muddy Waters Report* quoted a Fleet Manager and Former XL Fleet Customer as stating: "[s]omeone would probably not save money at $13k [per kit] on a pure fuel basis."

97.    The Muddy Waters Report stated that XL Fleet took steps to conceal the performance of its products from customers who had purchased them, quoting former employees as stating that XL Fleet refused to give customers access to the XL Link system that recorded data on the products' performance, and that XL Fleet employees would try to make this data seem better than it was when discussing it with customers, and to deflect blame for poor performance.

### 7.    *XL Fleet's Revenue Projections*

98.     According to Defendants, XL Fleet's sales pipeline was a critical input into its revenue forecast.  As described in Pivotal's Form S-4/A filed with the SEC on November 12, 2020, "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."  Accordingly, the inclusion of non-viable sales opportunities in the pipeline and the exaggeration of the recorded likelihood of sales had the effect of not only inflating the sales pipeline figure but also inflating the revenue forecast upon which it was based.

99.     XL Fleet's supply chain problems, low customer reorder rates, large number of inactive customers, and the weakness of its technology all operated to render XL Fleet's revenue forecast unrealistic and undermine the assumptions upon which that forecast was based. Defendants' failure to disclose these factors caused the market to materially underestimate the risk that XL Fleet's forecast would not be achieved.

100.     Additional facts support the conclusion that XL Fleet's revenue forecast lacked a reasonable basis and was likely unachievable.  According to FE2, FE2 was not able to sell any products during her tenure at XL Fleet, which she attributes in part to the fact that these products were too expensive for their emission reduction capabilities, and that the return on investment was not enough to make the cost worthwhile for customers.

101.     According to the Securities Class Action complaint, FE2 was given a sales target of $12 million for 2021, even though she had never been able to sell an XL product, and even though the entire company had only $20.3 million in 2020 revenues.  This sales target was not based on identified sales opportunities, but rather was simply imposed by XL executives.

102.     According to FE2, Hynes and Kazarinoff told Piern that the sales team as a whole needed to sell $75 million for 2021, and the sales team was not allowed to offer any feedback on

whether this target was achievable.  According to FE2, Piern then simply divided up the $75 million total sales target among the sales team, assigning FE2 $12 million of the total without much reasoning other than the need to divide up the total target.

103.    Leading up to the Business Combination, XL Fleet repeatedly disclosed its projection of $75 million in 2021 revenue.

104.    According to the Securities Class Action complaint, FE2 did not believe that her $12 million 2021 sales target was possible to meet with only hybrid products to offer.  XL Fleet projected that hybrid products would account for substantially all of its 2021 sales.

105.    Similarly, according to FE1, during her tenure at XL Hybrids, neither she nor anyone else met their sales goals.

106.    Taken together, the foregoing facts tended to seriously undermine the accuracy of XL Fleet's revenue forecast and the failure to disclose these facts rendered the issuance of the forecast and Defendants' related statements misleading.

**E.**    **Defendants Aggressively Promoted The Proposed Merger**

107.    XL Hybrids issued at least eight, highly promotional press releases, each of which promoted the proposed Merger and touted XL Hybrids' technology and customer base.

108.    XL Hybrids issued a September 30, 2020 press release titled "XL Fleet to Accelerate Rapid Growth and Expand Fleet Electrification Solutions Through Proposed Merger with Pivotal Investment Corporation II."  XL Hybrids stated in an October 26, 2020 press release that it was "revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."  In a November 1, 2020 press release titled "XL Fleet Generates Record Third Quarter 2020 Revenue," XL Hybrids reiterated its $220 million sales pipeline and $75 million 2021 revenue

forecast, in addition to promoting "record quarterly total GAAP revenue of $6.3 million for the third quarter of 2020."

109.    XL Hybrids issued similarly promotional press releases on November 16, 2020, November 23, 2020 ("XL Fleet Expects its Largest Partner to Double Orders in 2021"), December 1, 2020, December 11, 2020, and December 16, 2020 ("XL Fleet Expands Electrification Solutions Portfolio to Ford F-550 Chassis to Meet Strong Customer Demand").

110.    On October 26, 2020, Defendants Hynes and Kazarinoff, as well as Pivotal representative Greg Racz, appeared in a webinar hosted by SPAC Insider to promote XL Hybrids and the proposed Merger. Defendant Kazarinoff stated: "Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue."

111.    On November 12, 2020, Defendant Hynes gave an interview on *Bloomberg TV* similarly promoting XL Hybrids' business prospects.  Defendant Hynes stated: "We're growing extremely rapidly already . . . we're already experiencing tremendous growth."  Defendant Hynes likewise aggressively promoted XL Hybrids' prospects in a November 16, 2020 webinar hosted by IPO Edge and a November 23, 2020 interview with TD Ameritrade.  During the November 23, 2020 interview, Defendant Hynes stated: "We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and we're really scaling up across the country."

112.    At the same time that Defendants carried out this media blitz promoting XL Hybrids and the proposed Merger, they and their advisors were preparing the required SEC filings, investor disclosures, and other legal documentation for the proposed Merger.

113.     On October 2, 2020, Pivotal filed a Registration Statement on Form S-4 with the SEC containing a preliminary prospectus supplement and proxy statement for Pivotal's annual meeting to be held later in the year, in order to register up to 100 million shares of Pivotal's stock to be issued to XL Hybrids' shareholders in connection with the proposed Merger.  In the October 2, 2020 Registration Statement, Pivotal first disclosed XL Fleet's backlog of existing purchase orders, stating:

> As of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time. All XL orders are designed to meet a specified OEM vehicle chassis (VIN level), with production and shipment coordinated to meet simultaneously via the industry standard ship-thru process. XL systems are sourced and built to exacting specifications in line with OEM production timelines and customer installation preferences, and supply is sourced to meet these timelines.

114.     Pivotal further stated: "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

115.     These statements were misleading because they failed to disclose the severe supply chain problems, which prevented XL Fleet from timely converting backlog into revenue.  As such, XL Fleet's backlog presented a misleading indicator of future performance, because Defendants lacked the supplies necessary to fill existing purchase orders within the 3 to 6 month lead time indicated by Pivotal's statement.

116.     While Defendants did provide certain risk warnings and other disclosures concerning battery supply issues, these disclosures were themselves misleading because they failed to disclose the extent to which the risks had already materialized and they understated the severity, scope and duration of the existing shortages.  For instance, in the Risk Factors section of the October 2, 2020 Registration Statement, Pivotal stated:

33

*Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business.*

In the production of its electrified powertrain solutions, XL may experience increases in the cost or a sustained interruption in the supply or shortage of its components. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components fluctuate depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. … Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified. [Emphasis added].

117. This statement was misleading because it suggested that an interruption in supply or a shortage in components were eventualities that XL Fleet "may experience," but did not disclose that XL Fleet was already experiencing these supply disruptions and that they were already severely impacting XL Fleet's ability to fill existing customer orders.

118. In the October 2, 2020 Registration Statement, Pivotal also made the following disclosure regarding battery supply issues:

Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020. The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020.

119. This partial disclosure gave the market some indication that XL Fleet had already experienced supply shortages, but the statement was also highly misleading because it only gave a small part of the story. According to former employees, XL Fleet had been experiencing severe battery shortages going back to May 2019, long before COVID-19 began to impact the global supply chain. For the entire second half of 2019 and the entire first half of 2020, XL Fleet had an incredibly limited supply of batteries and was unable to fill the vast majority of customer orders. As recounted by the former employees, the principal reason that XL Fleet could not obtain batteries

was because of XL Fleet's status as a "small fish" in the market and the priority that was given to larger customers by third-party battery suppliers. While Defendants claimed that XL Fleet and its suppliers had taken steps to "mitigate" the supply disruptions, Defendants failed to adequately describe the severity, the scope, and the longstanding duration of the problem. Moreover, XL Fleet's revenue forecast of $75 million for 2021 assumed that revenues would more than triple between 2020 and 2021, which meant that production would also need to more than triple and XL Fleet would need to obtain a much higher number of batteries to meet its revenue target. Without disclosing the long-standing nature of XL Fleet's problems in obtaining batteries and by portraying the issue as a temporary problem relating to COVID-19, Defendants' representations concerning XL Fleet's "scalable business model" and "established supply chain production capacity" were misleading and caused the market to materially underestimate the magnitude of the risks inherent in XL Fleet's revenue forecast.

120.   Pivotal amended its Registration Statement on November 12, 2020, December 1, 2020, and December 4, 2020. Each amended version of the Registration Statement was false and misleading for similar reasons as the original version filed on October 2, 2020.

121.   In its Form S-4/A dated November 12, 2020 (which amended the October 2, 2020 Registration Statement), Pivotal made two new relevant disclosures concerning the supply chain and battery supply issues. Pivotal stated:

> In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's primary battery test facility, halted testing of XL's HEV battery, preventing the validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a purchase order service arrangement.

Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

122.    Pivotal also stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the resolution of battery supply issues, increased end customer demand and increased order sizes.  During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog.

Based upon XL's current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million.

123.    These statements were misleading for the same reasons that the statements in the October 2, 2020 Registration Statement were misleading.  By characterizing the battery supply issues as principally due to the impact of the COVID-19 pandemic and failing to disclose the severity, scope and duration of the battery supply issues arising from XL Fleet's lack of market power and leverage in the battery market, Defendants materially misled investors as to nature and likely persistence of the problem.  Worse still, the statements in the November 12, 2020 Amended Registration Statement suggested that the battery supply problem had been "resolv[ed]" and that in the absence of "any further unforeseen supply chain disruptions," XL Fleet was on track to meet its forecast of $21 million in revenue for 2020.  The November 12, 2020 Amended Registration

Statement also repeated the forecast of $75 million in revenue for 2021. The facts support a strong inference that by November 12, 2020, it was already clear that XL Fleet did not have access to a sufficient number of batteries to meet the 2021 revenue forecast of $75 million, and that the purportedly new and unexpected shortages that Defendants would disclose just a few months later were not "unforeseen" but merely a continuation of a long-standing supply chain problems that existed well before COVID-19.

124.    The SEC issued a notice of effectiveness for Pivotal's Registration Statement on Form S-4 as of December 8, 2020. On that date, Pivotal filed with the SEC its definitive proxy statement for the annual meeting and its prospectus for the issuance of up to 100 million shares of stock to XL Hybrids' shareholders in connection with the proposed Merger. The proxy statement provided that holders of record of Pivotal stock at the close of business on December 7, 2020 would be entitled to vote at the annual meeting, on matters including the proposed Merger and certain ancillary proposals necessary to complete the proposed Merger.

125.    In its December 8, 2020 definitive proxy statement and prospectus, Pivotal provided information regarding XL Hybrids' order backlog, sales pipeline, and revenue forecasts.

126.    Regarding backlog, Pivotal repeated that: "[a]s of September 25, 2020, XL has a backlog of 961 firm purchase orders representing $12.3M in revenue. This backlog reflects the manner in which XL believes its customers currently purchase commercial vehicles, with a typical 3 to 6 month lead time."

127.    Regarding the sales pipeline, Pivotal repeated that XL Hybrids had a "a $220 million 12-month sales pipeline," and that "XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and

XL systems for such vehicles.  This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products."

128.    Regarding revenue forecasts, Pivotal disclosed revenue forecasts for XL Hybrids of $21 million for 2020, $75 million for 2021, $281 million for 2022, $648 million for 2023, and $1.4 billion for 2024.  Pivotal also explained that "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections."

129.    Pivotal stated that that "XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance," and that "XL believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance."

**F.    <u>The Merger Between Pivotal And XL Hybrids Is Completed</u>**

130.    On December 21, 2020, Pivotal held its annual meeting, and Pivotal shareholders voted to approve the proposed Merger and ancillary proposals necessary to complete the proposed Merger.

131.    On December 21, 2020, XL Hybrids merged with a wholly-owned subsidiary of Pivotal.  The outstanding securities of XL Hybrids were converted into securities of Pivotal. Pivotal changed its name to XL Fleet Corp.

132.    Pivotal directors Efrat Epstein and Katrina Adams resigned effective December 21, 2020, and Kazarinoff, Hynes, Frodl, Flanagan, Griffin, Hayes, Ledecky, Ramdev, and Sclarsic were appointed to serve as directors on Board of XL Fleet Corp.  The Board appointed Defendant Kazarinoff as CEO, Principal Financial Officer and Principal Accounting Officer, and appointed Defendant Hynes as President.  Defendants Ledecky and Brady resigned as officers of Pivotal.

133.    Also, on December 21, 2020, certain investors purchased shares of Pivotal/XL Fleet Corp. for gross proceeds totaling $150 million in a private placement.

134.    On December 21, 2020, Pivotal's Units automatically separated into their component stock and warrant securities. On December 22, 2020, Pivotal's stock and warrants ceased trading on the NYSE under the PIC and PIC WS ticker symbols, and began trading as XL and XL WS, respectively.

135.    Following the completion of the merger, XL Fleet Corp. reported that Defendant Ledecky beneficially owned 7.3% of its common stock, Defendant Griffin beneficially owned 7.7%, Defendant Hynes beneficially owned 5.6%, and Defendant Kazarinoff beneficially owned 1.0%, making these individuals among XL Fleet Corp.'s largest shareholders.

136.    On December 22, 2020, XL Fleet Corp. issued a press release reporting the completion of the merger.  The press release stated that XL Fleet received approximately $350 million in cash proceeds in connection with the merger, and touted the Company's technology, customer base, and future growth prospects.

**G.    After the Merger, Defendants Continue To
        Make False Statements About XL Fleet's Business**

137.    XL Fleet continued issuing press releases.  Each of these press releases described XL Fleet as follows: XL Fleet is a leading provider of vehicle electrification solutions for commercial and municipal fleets in North America, with more than 145 million miles driven by customers such as The Coca-Cola Company, Verizon, Yale University and the City of Boston.  XL Fleet's hybrid and plug-in hybrid electric drive systems can increase fuel economy up to 25-50 percent and reduce carbon dioxide emissions up to 20-33 percent, decreasing operating costs and meeting sustainability goals while enhancing fleet operations. XL Fleet's plug-in hybrid electric drive system was named one of TIME magazine's best inventions of 2019.

138.   On February 4, 2021, XL Fleet issued press releases entitled *XL Fleet Partnering with Curbtender to Develop All-Electric and Plug-in Hybrid Refuse Trucks*, and on February 25, 2021 another press release entitled *XL Fleet Becomes Electric Transportation Partner of UBS Arena and the New York Islanders, Plans to Deploy 1,000 EV Charging Stations*.

139.   On December 23, 2020, Defendant Hynes gave an interview to *CNBC's Squawk* on the Street television program.  When asked about XL Fleet's revenue forecasts, Defendant Hynes stressed the Company's "great pipeline" and "tremendous interest from customers" in a "trillion dollar global industry," and that XL was "shipping hundreds of units per month," before concluding that "we're in a great position to … really expand with the market which clearly has a lot of demand."

140.   Defendant Hynes appeared on the CNBC television program Mad Money with Jim Cramer on March 2, 2021 to promote XL Fleet's previously reported plans to partner with UBS Arena and the New York Islanders professional hockey team with respect to electric vehicle charging stations.

141.   On January 14, 2021, XL Fleet filed with the SEC a Registration Statement on Form S-1 and preliminary prospectus, to register 55.8 million shares of common stock and 4.2 million warrants.  The securities to be registered related to (i) XL Fleet shares issuable on the exercise of warrants issued by Pivotal at the time of its July 2019 IPO, (ii) XL Fleet warrants issued in the December 2020 private placement, and (iii) XL Fleet shares issued or issuable in connection with the December 2020 Business Combination to private placement investors, XL Hybrids' directors and officers, and private placement investors.

142.   The January 14, 2021 Registration Statement repeated much of the information regarding XL Fleet's business contained in Pivotal's October 2, 2020 Registration Statement on

Form S-4 (as amended), and was false and misleading for similar reasons. The January 14, 2021 Registration Statement continued to tout XL's business prospects, stating that "[w]e are one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so we have established significant experience, data and relationships enabling scalable production, supply chain and service compared to competitors with relatively few systems in operation. We also have established global customers and suppliers."

143.   On January 22, 2021, XL Fleet filed a prospectus. This prospectus was false and misleading for similar reasons as the Registration Statement filed on January 14, 2021.

144.   On February 26, 2020, XL Fleet's Board voted to approve large salary and target bonus increases for Defendants Kazarinoff and Hynes, based in substantial part on their 2020 performance. Kazarinoff's 2021 base salary was increased to $440,000, representing 150% of his 2020 base salary of $292,500. Kazarinoff's 2021 target bonus would be 70% of his (now greatly increased) base salary, as compared to the previous 30%. Hynes's 2021 base salary was increased to $372,500, representing 165% of his 2020 base salary of $225,000. Hynes's 2021 target bonus would be 50% of his base salary (i.e., $186,250), more than double his 2020 target bonus of $80,000.

## H.   The Truth Emerges

145.   On March 3, 2021, Muddy Waters published a report entitled *XL Fleet Corp (NYSE XL): More SPAC Trash*. The report contained a number of revelations exposing Defendants' fraud, based on interviews with former XL employees.

146.   The Muddy Waters Report quoted a person it identified as Former XL Employee A, as stating "I was paid to lie. I was paid to falsify and exaggerate my pipeline," and quoted a

Former XL Employee B as stating that she was instructed to record million-dollar sales opportunities for customers who had no interest in XL's products.

147.     Muddy Waters reported that XL Fleet was plagued by undisclosed supply chain failures, including an inability to procure the batteries that were vital components of all XL Fleet products, and without which XL Fleet could not deliver its products to customers.  Muddy Waters quoted Former XL Fleet Employee A as stating that XL Fleet received almost zero batteries during 2019, and only a small number during the first half of 2020.

148.     Muddy Waters also revealed that at least 18 of 33 high profile "customers" touted by XL Fleet in investor presentations had not ordered any XL Fleet products from at least 2019 through the first half of 2020, and that only 10% of XL Fleet customers placed follow-up orders due to disappointment with the actual results delivered by XL Fleet's misleadingly exaggerated technology.

149.     Muddy Waters exposed XL Fleet's falsification of customer mileage gains and return on investment, as XL Fleet had advertised to prospective customers and in investor presentations.  While XL Fleet claimed that customers experienced gains of approximately 25% in miles per gallon with XL Fleet's hybrid product, Muddy Waters quoted former XL Fleet employees as stating that this figure was based on testing conditions designed to maximize MPG, and that in real world conditions customers usually experienced only 5-10% MPG improvement. Muddy Waters similarly revealed that although XL Fleet advertised a 55.7% ROI for customers, this was based on falsified MPG savings and other inputs, and that customers often experienced zero or negative ROI with XL Fleet products.

150.     And Muddy Waters reported that former XL Fleet employees "literally laughed out loud at XL Fleet's revenue projections."

151.    On March 4, 2021, XL Fleet published a press release entitled *XL Fleet Responds to Recent Short-Seller Report*, in which the entirety of the Company's rebuttal of the highly detailed and incriminating Muddy Waters report stated: "[t]he report contains numerous factual inaccuracies, misleading statements, and flawed conclusions. The Company intends to respond in due course."

152.    On March 10, 2021, Muddy Waters published a follow-up report entitled *XL Fleet: Not Denying Much, Still SPAC Trash*, pointing out the XL Fleet had failed to deny many of the key allegations from Muddy Waters' initial March 3, 2021 report.

153.    *Reuters* published an article on March 3, 2021 entitled *XL Fleet shares tumble after Muddy Waters takes short position*.  The article noted that shares had fallen as much as 19.5% that day, and that Muddy Waters claimed the Company had "significantly exaggerated its order backlog, that the return on investment for its products was likely negative, and that it would not be able to compete with big car makers on electrification."

154.    On March 4, 2021, *Business Insider* published an article entitled *XL slumps 205 as famed investor Carson Block goes short, says the market is in a SPAC bubble full of 'garbage.'* The article stated that "Block alleged XL Fleet was misleading investors with an inflated sales backlog."  Carson Block is the founder and principal of Muddy Waters.

155.    XL Fleet later admitted that the fall in its publicly traded stock price was caused by the Muddy Waters Report.  XL stated in its 2020 annual report on Form 10-K that "[i]n March 2021, an entity published an article containing certain allegations against us.  This article and the public response to such article, as well as other negative publicity, have adversely affected our brand and reputation as well as our stock price," and that "in March 2021, an entity published an

article containing certain allegations against us that we believe has negatively impacted the trading price of our Common Stock."

156.   On March 31, 2021, XL Fleet reported its fourth quarter 2020 and full year 2020 financial results, issuing a press release, and filing a current report on Form 8-K and an annual report on Form 10-K with the SEC.  In addition, on March 31, 2021, the XL Fleet management team held a public conference call to discuss these results with investors.

157.   Defendants reported $10.9 million in fourth quarter 2020 revenue, and $20.3 million in full-year 2020 revenue.  As XL Fleet admitted in its annual report, much of this revenue was attributable to belatedly filling orders previously delayed and backlogged due to a lack of battery supplies, stating that "[o]f the $20.3 million in revenue for the year ended December 31, 2020, approximately $17.2 million of revenue was recognized during the second half of the year, which was primarily due to the resolution of battery supply issues and seasonality in the order and delivery of fleet vehicles," and that "[r]esolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog."

158.   Although Defendants had recently forecast $75 million in 2021 revenue, XL Fleet announced that it now expected first quarter revenue of only $1 million and stated that it would no longer provide full-year 2021 revenue guidance.  Although Defendants had recently hyped XL Fleet's purportedly dramatic growth prospects, they admitted in the press release that the $1 million of first quarter 2021 revenue guidance as "roughly flat versus the prior year quarter."

159.   Defendants attempted to deflect blame for this about-face by making excuses in their press release, quoting Defendant Kazarinoff as stating:

> "The world is electrifying – however, economies and businesses around the world continue to face ongoing impacts of the COVID-19 pandemic. As a result, we continue to experience significant friction including OEM delays amid microchip

and other shortages, and currently forecast first quarter 2021 revenue of approximately $1 million, or roughly flat versus the prior year quarter."

"Given this ongoing uncertainty and the potential for extended industry-wide issues, combined with typical seasonal patterns in our orders and a significant majority of revenues focused on the second half as in prior years, we are not currently providing formal full-year 2021 financial guidance. As these pressures abate, we expect to see a stronger market environment emerge later this year. In this scenario, we would expect to realize significant revenue growth in 2021, accompanied by even more pronounced seasonality and therefore weighting to the second half of the year."

160.   On XL Fleet's March 31, 2021 earnings call, Canaccord Genuity analyst Jed Dorsheimer questioned the severe drop off in projected revenues:

I'm trying to reconcile the 90% drop in revenues Q4 to Q1. Could you maybe help with the backlog? Because backlog shouldn't be affected. And if I look at the shortages from a chip perspective, I'm not seeing a drop that significant in terms of industry numbers. So . . . were things pulled into Q4 [2020] or are they just being pushed out into Q3 [2021]?

161.   In response, Defendants Kazarinoff and Hynes evaded these questions, while deflecting blame onto the COVID pandemic and seasonal ordering patterns.

162.   On April 1, 2021, Canaccord Genuity issued a report lowering its price target for XL Fleet from $30 to $10 "to reflect the lack of 2021 visibility."  The report stated that "XL provided guidance for Q1 sales of $1M, versus consensus expectations of $7.9M. The company attributes the shortfall to the auto industry's chip shortage and COVID-19 headwinds. Given this is the company's first quarter as a public company, this comes as a major disappointment."

163.   Following XL Fleet's release of fourth quarter and full-year 2020 earnings after the close of trading on March 31, 2021, on April 1, 2021 XL's stock closed at $7.89 per share, 12.1% lower as compared to the prior day, on exceptionally high trading volume.

164.    Independent market observers interpreted the disappointing 2020 results and the withdrawal of XL Fleet's 2021 guidance as effectively a confirmation of the allegations of the Muddy Waters Report.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED

**A.    September 18, 2020 Merger Announcement**

165.    On September 18, 2020, the Company announced the Merger Agreement had been entered into by and among Pivotal, Merger Sub, and XL Hybrids.  On that day, Pivotal and XL Hybrids jointly issued a press release. This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.

166.    The September 18, 2020 press release reported that XL Fleet's "rapidly deployable technology solutions position it for long-term growth in a total addressable market that is greater than $1 trillion[.]"  The press release also stated, "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."  The press release also stated that "[t]housands of XL units [were] already on the road and over 130 million miles [had been] driven by its more than 200 customers, including FedEx, The Coca-Cola Company, PepsiCo, Verizon, the City of Boston, Seattle Fire Department, Yale University, and Harvard University."  Ledecky was quoted in the press release as stating, "XL's revenues are expected to more than triple in 2021, cementing its status as the leading provider of vehicle electrification solutions for commercial and municipal fleet vehicles."

167.    The statements above were false and/or misleading because they failed to disclose the following adverse facts:

(a)    XL Fleet's reported sales pipeline of $220 million was overstated;

(b)      XL Fleet had been experiencing supply chain problems that impeded its ability to timely fill existing orders;

(c)      XL Fleet's customers had low reorder rates, and its customer base was overstated because a large number of the customers touted by XL Fleet were inactive;

(d)      the quality and benefits of XL Fleet's technology were overstated and that technology did not provide the MPG savings or ROI that XL Fleet represented to its customers;

(e)      XL Fleet's revenue forecasts lacked a reasonable basis, omitted facts tending to undermine the accuracy of the projections, and were overstated; and

(f)      As a result of the foregoing omissions, the challenged statements presented a misleading impression of XL Fleet's financial prospects, growth potential, and risk profile.

168.    In addition, the statements above were false and/or misleading when made because:

(a)      XL Fleet's technology was not "rapidly deployable" in light of XL's supply chain problems; and

(b)      XL Fleet's technology did not "position" XL Fleet for "long-term growth" because XL Fleet had overstated its technology's capabilities when in fact this technology produced weak results and led to substantial customer attrition; and

(c)      The list of significant customers in the press release was misleading in light of the fact that several of the most prominent customers (including FedEx, The Coca-Cola Company, PepsiCo, and Verizon) were inactive and no longer ordering XL Fleet products.

169.    On September 18, 2020, the Company held a conference call (the "September 18, 2020 Call") to discuss the Merger.  A transcript of the call was attached as Exhibit 99.3 to a Form

8-K signed by Ledecky and filed with the SEC by Pivotal on September 18, 2020.  On the

September 18, 2020 Call, Kazarinoff stated:

> We are proud of our differentiated position, with more units sold and more models available to meet customer needs.  We have more than 3,200 units on the road today and are experiencing great momentum.  We are shipping hundreds of additional units every month, putting us on target to deploy more than 4,000 systems by year-end and almost 10,000 units by the end of 2021. Additionally, our 9 available models today means we are more than double our closest competitor in offering the optionality and customization that the customer base really requires. Together with our scaled production capacity and significant customer base, we believe this establishes our leadership position in the market and a de-risked path to electrification.
>
> ***
>
> We have a 12-month rolling sales pipeline of more than 220 million dollars in potential new business opportunities, and we are on target to triple our 2020 revenues versus last year. More importantly from our perspective is the growth we've been realizing in average order size, with our largest order in 2020 growing by more than 3x versus last year. This is reflective of what we refer to as a transition from trial to adoption. Traditionally, this is a very conservative industry – only adopting new technology after it's been proven and is trusted, and we believe our order momentum is indicative of this transition for us and our customers.

170.    On the September 18, 2020 Call, Kazarinoff promoted the Company's ability to

increase its production capacity in very little time and claimed this would allow XL Fleet to "scale

at a rapid pace" to achieve "revenue up to approximately 1.5 billion dollars by 2024":

> Through our approach, we can significantly increase our own production capacity in very little time. For example, we can obtain an additional 10,000 units of capacity for less than 500 thousand dollars in about 6 months – and we can get up to 100,000 units of capacity for under 5 million dollars in less than 18 months.
>
> This is tremendous leverage, allows us to scale at a rapid pace, and differentiates us versus the competition.… We forecast to scale our revenue up to approximately 1.5 billion dollars by 2024, which reflects approximately 6 percent of the total market.

171.    On September 18, 2020 Call, Hynes also stated: "We have intentionally developed

a very scalable, asset-light business model that leverages the existing installation capacity of the

48

industry and provides maximum flexibility to our continued growth. Overall, we believe this positions us as a lower-risk path to electrification, providing electrification-as-a-service to our customers as we deliver reliability, sustainability and financial returns."

172.    The statements above were false and/or misleading because they failed to disclose the adverse facts set forth in ¶ 167.

173.    In addition, the statements above were false and/or misleading when made because:

(a)    The representations that XL Fleet's business model was "very scalable" and that XL Fleet could "scale at a rapid pace" was false and misleading due to XL's severe supply chain problems, which prevented XL Fleet from significantly increasing its production capacity in a short period of time; and

(b)    The representation that XL Fleet faced a "de-risked path to electrification" misleadingly omitted the significant risks that XL Fleet faced concerning its supply chain, inactive customers, and the quality and reliability of its technology.

174.    On September 18, 2020, the Company also issued an Investor Presentation which was attached as Exhibit 99.2 to a Form 8-K signed by Ledecky and filed with the SEC on September 18, 2020.  The September 18, 2020 Investor Presentation stated that XL Fleet had a "Broad portfolio of established, proven, cost-effective solutions for numerous classes/segments with rapid product development capabilities" and its "Established production can scale to 100,000+ units annually and XL's capital efficient operating model is ready to scale and drive profitably."

175.    The September 18, 2020 Investor Presentation stated that XL's "Power Train Platform Is Proven, Flexible and Scalable" and emphasized that its platform allowed:

Unique rapid integration of hardware and software
- <1 month to integrate new OEM battery into vehicles

- <3 months to production (including crash testing)
Quickly scaling across vehicle classes, OEM platforms and applications
- <1 month to develop HEV for new OEM chassis
- <6 months to production

176.    The Investor Presentation also stated that XL Hybrids had a "Low Risk Path to Dramatic Growth" that could be achieved by "[s]elling existing products to existing customers through existing channels."

177.    On September 18, 2020, Hynes was interviewed on CNBC's Squawk Box.  A transcript of this interview was filed as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed by Pivotal with the SEC on September 21, 2020.  During the interview, Hynes stated that XL Fleet's "established supply chain production capacity" would enable it to scale and reach $75 million in revenue in 2021:

> We're growing at 3X this year. ***We'll do over 75 million in revenue next year***.…
> So, you know, we have the ***established supply chain production capacity***, we have
> a very low risk and low cost production process compared to other companies in
> the industry. So, we don't have to invest hundreds of millions or billions of dollars
> into factories. ***We're actually leveraging the existing production infrastructure
> and enabling us to scale*** without huge amounts of capital to build out that capacity.
> [Emphasis added].

178.    The statements above were false and/or misleading because they failed to disclose the adverse facts set forth in ¶ 167.

179.    The October 2, 2020 Registration Statement also stated that the Company's "sales opportunity pipeline and committed backlog are important indicators of future performance": Key factors affecting XL Fleet's operating results include its ability to increase sales of its current product offerings and expand its product offerings in the future and customer demand for such product offerings.  XL Fleet believes that the size of its sales opportunity pipeline and committed backlog are important indicators of future performance.

180.   The statements above were false and/or misleading because they failed to disclose the adverse facts set forth in ¶ 167(a)-(b) and (e)-(f).

181.   The October 2, 2020 Registration Statement further stated that XL Fleet and its suppliers and OEMs had made improvements in XL Fleet's supply chain during the second half of 2020 that XL Fleet believed would "mitigate the supply disruptions experienced during the first half of 2020" due to the COVID-19 pandemic:

> Revenues decreased by $1.2 million, or 27.6%, from $4.3 million in the six months ended June 30, 2019 to $3.1 million in the same period in 2020.  The decrease was primarily due to disruptions in battery supply and disruptions in OEM vehicle production due to the COVID-19 pandemic. XL and its suppliers and OEMs have made improvements in XL's supply chain during the second half of 2020 that XL believes will mitigate the supply disruptions experienced during the first half of 2020.

182.   The statements above were false and/or misleading because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

183.   In addition, the statements above were materially false and/or misleading when made because:

(a)   The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL Fleet during the first half of 2020 and failed to disclose that XL Fleet had been suffering from severe battery shortages going back to at least May 2019;

(b)   The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID;

(c)   The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and

51

(d)      The statements failed to disclose that XL Fleet's "mitigation" efforts were insufficient to secure enough batteries for the massive expansion of production that was contemplated by XL Fleet's revenue forecast for 2021.

184.    The October 2, 2020 Registration Statement claimed its relationships "enabl[ed] scalable production, supply chain and service compared to competitors" and touted its "established global customers and suppliers:"

> XL is one of only a few companies that have deployed thousands of xEV powertrains in the Class 2-6 commercial fleet market in the U.S. and Canada, so XL has established significant experience, data and relationships ***enabling scalable production, supply chain and service compared to competitors*** with relatively few systems in operation. XL also has ***established global customers and suppliers***. [Emphasis added].

185.    The statements above were false and/or misleading because they failed to disclose the adverse facts set forth in ¶ 167(b), (f).

186.    The October 2, 2020 Registration Statement noted the environmental standards that XL was subject to and stated that "violations may also result in the suspension or revocation of permits and licenses":

> Environmental standards applicable to XL are established by the laws and regulations of the countries in which it operates, standards adopted by regulatory agencies and the permits and licenses that it holds. Each of these sources is subject to periodic modifications and increasingly stringent requirements. Violations of these laws, regulations or permits and licenses may result in substantial civil and criminal fines, penalties, orders to cease the violating operations or to conduct or pay for corrective works. In some instances, violations may also result in the suspension or revocation of permits ***and licenses***.  [Emphasis added].

187.    The October 2, 2020 Registration Statement stated that XL Fleet's systems are fitted to vehicles that have been certified to meet the requirements of the California Air Resources Board ("CARB") and that XL Fleet had obtained the requisite Executive Orders ("EOs") for prior model

years and was in the process of EOs for future products.  The October 2, 2020 Registration

Statement stated:

### CARB Emissions Compliance and Certification

The XL hybrid and plug-in hybrid systems are fitted to vehicles that have been certified to meet the requirements of U.S. Environmental Protection Agency (the "EPA") and California Air Resource Board ("CARB"). The OEMs are responsible for ensuring compliance with the appropriate regulations for the base vehicle for emissions, fuel economy and on board diagnostics. CARB classifies the XL system as an aftermarket fit system/device.  As such, CARB requires that an Executive Order ("EO") is obtained for the sale of the system intended for use on a vehicle to be operated in the state of California. In order to obtain the EO, XL is required to submit an application to CARB for each vehicle group or family, which is required for each model year. The vehicle models included in a group or family are determined by the level of commonality of vehicle systems on both the base vehicle and the hybrid or plug in hybrid systems that are fitted.

\*\*\*

***XL has obtained a number of EOs for prior model years and is in the process of conducting testing against CARB issued test orders for future products to be introduced into the Californian market***. EOs issued by CARB to XL are public record and are available to view on the CARB database for aftermarket, performance, and add-on parts. EOs also include requirements to collect data from vehicles in the field (in use data).  [Emphasis added].

188.    The statements above are false and/or misleading because they failed to disclose

that:

(a)    XL Fleet had lost its CARB certification in 2019 and had been unable to

secure re-approval in 2020, so XL Fleet could not sell its products in California;

(b)    The risk warning concerning the potential revocation of permits or licenses

presented as mere hypothetical risks adverse events that had already materialized; and

(c)    The inclusion of California sales opportunities in XL Fleet's sales pipeline,

when XL Fleet was not permitted to sell its products in California, resulted in an artificial

inflation of the pipeline and the revenue forecasts based on those pipeline figures.

189.    The October 2, 2020 Registration Statement touted the purported mileage gains resulting from use of XL Fleet's products:

> XL's hybrid systems (branded as "XLH™") have been proven to **improve MPG by up to 25%** over standard gas-powered vehicles, while reducing CO2 emissions by up to 20%. Its plug-in hybrid system, branded as "XL Plug-In™" or "XLP™, was named one of TIME magazine's The 100 Best Inventions of 2019. It offers an even more significant improvement in these metrics, demonstrating **up to a 50% MPG improvement** and up to a 33% reduction in emissions.  [Emphasis added].

190.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(d).

191.    The October 2, 2020 Registration Statement stated that in the judgment of Pivotal's board of directors, XL Fleet's value was at least 80% of the assets held in Pivotal's trust account. While acknowledging that Pivotal's board did not obtain a third-party valuation of XL Fleet, the Registration Statement emphasized the "significant due diligence" conducted by Pivotal's board and concluded that the business experience of Pivotal's directors entitled them to conclude that the transaction was fair to Pivotal's stockholders and the 80% test was satisfied:

> **Pivotal's board of directors did not obtain a third-party valuation or fairness opinion** in connection with its determination to approve the Business Combination. Accordingly, investors will be relying solely on the judgment of Pivotal's board of directors in valuing XL and assuming the risk that the Pivotal board may not have properly valued the business. **However, Pivotal's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and have substantial experience with mergers and acquisitions. Furthermore, in analyzing the Business Combination, Pivotal's board of directors conducted significant due diligence on XL. Based on the foregoing, Pivotal's board of directors concluded** that its members' collective experience and backgrounds, together with the experience and sector expertise of Pivotal's advisors, enabled it to make the necessary analyses and determinations regarding the Business Combination, including **that the Business Combination was fair from a financial perspective to its stockholders and that XL's fair market value was at least 80% of the assets held in the trust account** (excluding the deferred underwriting commissions and taxes payable on interest earned on the trust account) at the time of the agreement to enter into the Business Combination. There can be no assurance, however, that Pivotal's board of directors was correct in its assessment of the Business Combination.

*** 

After consideration of the factors identified and discussed in the section entitled "The Business Combination Proposal—Pivotal's Board of Directors' Reasons for Approval of the Business Combination," Pivotal's board of directors concluded that the Merger met all of the requirements disclosed in the prospectus for Pivotal's initial public offering, including that XL has a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the amount of deferred underwriting commissions held in trust) at the time of the execution of the Merger Agreement.  [Emphasis added].

192.    Furtther, the October 2, 2020 Registration Statement stated:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of incorporation that any business acquired by Pivotal have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for an initial business combination. ***Based on the financial information used to approve the Business Combination described herein, Pivotal's assessment that XL's valuation was attractive compared to its competitive peers and the other information described herein, Pivotal's board of directors determined that this requirement was met.*** In reaching this determination, Pivotal's board of directors concluded that it was appropriate to base such valuation on a number of qualitative factors, such as management strength and depth, competitive positioning, customer relationships and technical skills, as well as quantitative factors, such as the historical performance of XL and the ***potential for future growth in revenues*** and profits of XL, rather than rely on any one factor. Pivotal's board of directors believes that the financial skills and background of its members qualify it to conclude that the acquisition met the 80% requirement.

*** 

**Recommendation of Pivotal's Board of Directors**

After careful consideration of the matters described above, particularly XL's position in its industry, potential for growth and profitability, the experience of XL's management and XL's competitive positioning, its customer relationships and technical skills, ***Pivotal's board determined unanimously that each of the business combination proposal and the other proposals to be presented at the annual meeting are fair to and in the best interest of Pivotal's stockholders*** …. Pivotal's board of directors has approved and declared advisable and unanimously recommend that you vote or give instructions to vote "FOR" each of these proposals and "FOR" each of nine director nominees identified in this proxy

statement/prospectus to serve as directors of the combined company. [Emphasis added].

193. The statements above were materially false and/or misleading when made because they failed to disclose the following adverse facts:

(a) XL Fleet's value was not equal to at least 80% of the balance of funds in Pivotal's trust account, for all of the reasons set forth in ¶ 167(a)-(f);

(b) For the same reasons, the proposed business combination was not in the best interests of Pivotal's stockholders;

(c) The determinations by Pivotal's board of directors concerning XL Fleet's valuation and the fairness of the transaction lacked a reasonable basis, because Pivotal's directors either knew the adverse facts or would have known those facts had they engaged in the extensive due diligence that they claimed they conducted; and

(d) For the additional reasons, Pivotal's directors, including Ledecky and Griffin, knew or were severely reckless in not knowing the adverse facts that seriously undermined XL Fleet's putative value and the accuracy of XL Fleet's projections.

194. The October 2, 2020 Registration Statement claimed that XL Fleet's management believed that the assumptions and estimates on which the XL Fleet's revenue forecast was based were reasonable and based on the best then-currently available information: costs are based are believed by XL's management to be ***reasonable and based on the best then-currently available information***, the financial forecasts are forwardlooking statements that are based on assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond XL Fleet's control.

195. The October 2, 2020 Registration Statement incorporated XL Fleet management's forecast that XL Fleet would achieve revenues of approximately $21 million in 2020 and revenues

of approximately $75 million in 2021.  The Registration Statement also claimed that XL Fleet's management prepared its projections on a "reasonable basis" which "reflects the best currently available estimates and judgments":

> XL does not as a matter of course make public projections as to future sales, earnings or other results. However, XL's management has prepared the prospective financial information set forth below to present the key elements of the forecasts provided to Pivotal. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of XL's management, was **prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief**, the expected course of action and the expected future financial performance of XL.

***

> The key elements of the forecasts provided to Pivotal, which assumes accelerating sales of XL's existing Class 2-6 hybrid electric vehicle and plug-in hybrid electric vehicle solutions bolstered by the commencement of sales of XL's all-electric solutions for Class 4-6 vehicles and xEV solutions for Class 7-8 vehicles in 2022, are summarized in the table below:

*Key Financial Metrics:*

|  | Forecast | | | | |
|  | Year Ended December 31, | | | | |
|  | **2020E** | **2021E** | **2022E** | **2023E** | **2024E** |
|  | (in millions) | | | | |
| Total Revenue | $ 21 | $ 75 | $ 281 | $ 648 | $1,377 |
| Gross Profit | 2 | 17 | 69 | 158 | 340 |
| EBITDA | (10) | (15) | 31 | 117 | 308 |

196.  The statements above were false and/or misleading when made because they failed to disclose the following adverse facts:

(a)    The revenue forecasts prepared by XL Fleet management lacked a reasonable basis, for all of the reasons set forth in ¶ 167(a)-(f);

(b)     XL Fleet management was directly involved in the pipeline inflation scheme;

(c)     XL management was aware of the supply chain disruptions and shortages;

(d)     XL management was aware of low customer reorder rates and that many of the prominent customers they chose to tout had been inactive;

(e)     XL management was aware that XL's technology did not provide the MPG savings or ROI to customers that XL represented; and

(f)     XL management was aware that XL's revenue projections lacked a reasonable basis and were materially overstated.

**D.     The October 26, 2020 Press Release And Form 8-K**

197.    On October 26, 2020, Pivotal and XL issued a press release.  This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on October 26, 2020.  The press release stated: "The Company is revenue-generating today with strong demand momentum, including a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021."

198.    The statement above was false and/or misleading when made because it failed to disclose the adverse facts set forth in ¶ 167(a)-(f).

**E.     The October 26, 2020 SPACInsider Webinar And October 28, 2020 Form 8-K**

199.    On October 26, 2020, representatives of Pivotal and XL participated in a webinar hosted by SPACInsider.  Pivotal attached a copy of the transcript of the webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC on October 28, 2020.

200.    At the October 26, 2020 webinar, Kazarinoff stated:

***We've already got established scaled production, a scaled customer base***. So, we truly are in the lead here in North America and our position to keep that lead for years to come.

***

Our individual order sizes have been growing rapidly as we're seeing folks go from trial to actual adoption, and ***we've got a 12 months sales pipeline that now is over $240 million, which we feel is going to support our forecast for next year of $75 million in revenue***. We are currently tripling revenue here in the middle of this pandemic, despite some of those challenges and on track for $21 million in revenue in 2020. [Emphasis added].

201.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(a)-(f).

202.    At the October 26, 2020 webinar, Hynes stated that "vehicles are getting built and then shipped to the end customer, again, anywhere in the U.S. or Canada" and "We're in about every state except for Alaska at this point."

203.    The statements above were false and/or misleading when made because they failed to disclose that:

(a)     XL had lost its CARB certification in 2019 and had been unable to secure re-approval in 2020, so XL could not sell its products in California.

(b)     The inclusion of California sales opportunities in XL's sales pipeline, when XL was not permitted to sell its products in California, resulted in an artificial inflation of the pipeline and the revenue forecasts based on those pipeline figures.

204.    Further, at the October 28, 2020 webinar, Kazarinoff stated that "we're leveraging that existing network and we can ramp-up our own preassembly and logistics operation to that 100,000 unit a year level with less than $5 million in investment in less than 18 months.  So, we've already got an established business model that's very scalable."

59

205.     The moderator at the webinar asked how the Company was able to achieve rapid installation for a large order and Kazarinoff replied: "our network of upfitters folks we already have agreements with.  They've got over a hundred locations around North America with capacity to process large numbers of vehicles."  Hynes added: "we have been getting increasingly large orders from major fleet customer over the years.  So this is something that we've already done and *we can definitely scale and continue to accelerate with more and more customers who are buying at this size*."  [Emphasis added].

206.     The statements above were materially false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b), (f).

**F.     The November 12, 2020 Press Release**

207.     On November 12, 2020, XL Fleet issued a press release reporting its third quarter 2020 financial results.  This press release was also filed by Pivotal with the SEC pursuant to Rule 425 under the Securities Act of 1933 on November 12, 2020.  The press release stated:

> Due to strong year-to-date results, XL remains on track to deliver on its full year 2020 revenue forecast of approximately $21 million. *XL continues to grow its sales opportunity pipeline for 2021 to $220 million as of today, which supports XL's current revenue forecast of $75 million for fiscal year 2021*.
>
> ***
>
> "Fleet electrification is a massive long-term opportunity supported by favorable market and regulatory trends and an enduring focus on the decarbonization of operations by fleet owners globally," said Tod Hynes, Founder and Chief Strategy Officer of XL. "We are committed to delivering solutions that meet our customers' sustainability objectives and reliability requirements through products and services *available today*. Moreover, XL's strong track-record, long-term relationships, *and established supply chain partnerships continue to provide opportunities to further scale our business and broaden our product portfolio*."  [Emphasis added].

208.     The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(a)-(f).

**G.    The November 12, 2020 Amendment To The Registration Statement**

209.    On November 12, 2020, Pivotal filed an amendment to the October 2, 2020 Registration Statement on Form S-4/A with the SEC (the "November 12, 2020 Amendment).

210.    With respect to XL's backlog, the November 12, 2020 Amendment added the following language:

> XL's sales and marketing team uses a software tool to track all sales opportunities to existing and potential customers, identifying specific vehicles and XL systems for such vehicles. This is used by XL management to create projections about future aggregate sales pipeline opportunities for its existing products. XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections. ***XL management believes that its revenue estimates and committed backlog are important indicators of expected future performance***. [Emphasis added].

211.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(a)-(b) and (e)-(f).

212.    In addition, the statements above were false and/or misleading when made because:

(a)    Backlog presented a misleading indicator of future performance due to XL's severe supply shortages, which prevented XL from timely converting backlog into revenue.

(b)    XL lacked the supplies necessary to fill existing purchase orders within the "3 to 6 month lead time" that XL represented to be "typical."

213.    With respect to battery supply, the November 12, 2020 Amendment revised the risk factor disclosure:

> ***Increases in costs, disruption of supply or shortage of XL's components, particularly battery cells, could harm its business.***
>
> In the production of its electrified powertrain solutions, ***XL has experienced and in the future may again experience increases in the cost or a sustained interruption in the supply or shortage of its components***. Any such increase or supply interruption could materially negatively impact XL's business, prospects, financial condition and operating results. The prices for XL's components fluctuate

depending on market conditions and global demand and could adversely affect its business, prospects, financial condition and operating results. For instance, XL is exposed to multiple risks relating to price fluctuations for battery cells. These risks include:

- the inability or unwillingness of current battery manufacturers to build or operate battery cell production facilities to supply the numbers of battery cells required to support the growth of the electric vehicle industry as demand for such cells increases;

- disruption in the supply of cells due to quality issues or recalls by the battery cell manufacturers; and

- an increase in the cost of raw materials.

Any disruption in the supply of battery cells could temporarily disrupt production of XL's electrified powertrain solutions until a different supplier is fully qualified.

Moreover, battery cell manufacturers may refuse to supply electric vehicle manufacturers if they determine that the vehicles are not sufficiently safe. Furthermore, fluctuations or shortages in petroleum and other economic conditions have in the past and may again in the future cause XL to experience significant increases in freight charges. Substantial increases in the prices for raw materials have in the past and may again in the future increase the cost of XL's components and consequently, the costs of products. There can be no assurance that XL will be able to recoup increasing costs of its components by increasing prices, which could reduce its margins. [Emphasis added].

214.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

215.    In addition, the statements above were materially false and/or misleading when made because the risk warnings failed to disclose specific facts concerning XL's pre-existing shortages and supply problems that were necessary for investors to understand the magnitude of the risks at issue.

216.    The November 12, 2020 Amendment made two new additional disclosures concerning the supply chain and battery supply issues.  First, Pivotal stated:

In the first half of 2020 as result of the COVID-19 pandemic, XL experienced multiple supply and service disruptions impacting XL's HEV product line. XL's

primary battery test facility, halted testing of XL's HEV battery, preventing the validation of a newly designed battery. After several weeks, XL was able to find an alternate test facility, to restart the battery validation. This required sourcing, contracts, test plan development, training, and movement of essential hardware and equipment from the original location in New York to California resulting in a several month delay. Both test facility service providers are procured under a purchase order service arrangement.

Further, an XL battery supply partner, operating under a multi-year non-exclusive supply agreement with volume and pricing commitments, had significant supply disruptions in the April-May timeframe due to sub-supplier impacts on the Indiana and Michigan labor forces. In addition, Ford Component Sales (FCS), with whom we procure battery components under a month to month purchase order, had battery supply disruptions with a temporary closure of its manufacturing plant in Rawsonville, Michigan. This closure impacted the supply of HEV batteries to XL by several weeks.

217.    November 12, 2020 Amendment also stated:

Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the resolution of battery supply issues, increased end customer demand and increased order sizes. ***During the quarter ended September 30, 2020, XL, its suppliers and OEMs made improvements to XL's supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on XL's business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed XL to increase production and fulfill orders in its outstanding backlog***.

Based upon XL's current production throughput and its current backlog of orders, and subject to any further ***unforeseen supply chain disruptions caused by the COVID-19 pandemic***, XL anticipates revenues for the year ending December 31, 2020 to be approximately $21 million. [Emphasis supplied].

218.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

219.    In addition, the statements above were false and/or misleading when made because:

(a)    The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of

2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019;

(b)    The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID;

(c)    The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and

(d)    The statements misleadingly suggested that the battery supply issues had been "resolv[ed]" and failed to disclose that the "improvements to XL's supply chain" were insufficient to secure enough batteries for the massive expansion of production that was contemplated by XL's revenue forecast for 2021.

220.    With respect to the satisfaction of the test that XL's value be equal to at least 80% of the assets in Pivotal's trust account, the November 12, 2020 Amendment revised the statement to state:

**Satisfaction of 80% Test**

It is a requirement under Pivotal's current amended and restated certificate of incorporation that any business acquired by Pivotal have a fair market value equal to at least 80% of the balance of the funds in the trust account (excluding the deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for an initial business combination. The balance of the funds in Pivotal's trust account (excluding deferred underwriting commissions and taxes payable) at the time of the execution of the Merger Agreement with XL was approximately $223 million. In determining whether the 80% requirement was met, rather than relying on any one factor, Pivotal's board of directors concluded that it was appropriate to base such valuation on a number of qualitative factors, such as management strength and depth, competitive positioning, customer relationships and technical skills, as well as quantitative factors, such as the anticipated implied enterprise value of the combined company being approximately $1 billion with no material debt expected to be outstanding, Pivotal's assessment that XL's valuation was attractive compared to its competitive peers, the historical performance of XL and the *potential for future growth in revenues and profits of XL and a $220 million 12-month sales pipeline*. Based on the qualitative and quantitative information used to approve the Business Combination described herein, Pivotal's

board of directors determined that the foregoing 80% fair market value requirement was met. Pivotal's board of directors believes that the financial skills and background of its members qualify it to conclude that the acquisition met the 80% requirement. [Emphasis added].

221.   The statements above were false and/or misleading when made because they failed to disclose the following adverse facts:

(a)   XL's value was not equal to at least 80% of the balance of funds in Pivotal's trust account;

(b)   The determination by Pivotal's board of directors concerning XL's valuation lacked a reasonable basis, because Pivotal's directors either knew the adverse facts or would have known those facts had they engaged in the extensive due diligence that they claimed they conducted; and

(c)   Pivotal's directors knew or were severely reckless in not knowing the adverse facts that seriously undermined XL's putative value and the accuracy of XL's projections.

## H.   The November 16, 2020 Press Release And Form 8-K

222.   On November 16, 2020, XL Fleet issued a press release entitled *XL Fleet Expands XLP™ Plug-in Hybrid Electric Drive System For Use in Multiple GM Fleet Applications*. This press release was also attached as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC by Pivotal on November 16, 2020. The Company claimed it was able to "immediately serve this market:"

"Companies and municipalities are focused on electrifying a larger percentage of their fleets, while ensuring they uphold their performance and operational requirements," said Tod Hynes, Founder and Chief Strategy Officer of XL Fleet. "XL's ability to electrify a wide range of commercial applications from the world's leading vehicle manufacturers allows us to ***immediately serve this market*** with proven, high performance vehicles that are already designed and specified for the rigorous duty cycles of fleets." [Emphasis added]

223.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b), (d), and (f).

**I.    The November 16, 2020 IPO Edge Webinar And November 19, 2020 Form 8-K**

224.    On November 16, 2020, Hynes participated in a webinar hosted by IPO Edge.  On November 19, 2020, the Company attached a copy of the transcript of that webinar as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC.  Hynes stated: "We have a very low cost and highly scalable production capacity that leverages the existing manufacturing capacity of the industry. So our systems get installed as the vehicles are manufactured and then shipped anywhere in the country and end up as brand new vehicles at the customer's location."

225.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

**J.    Hynes' November 23, 2020 Interview With TD Ameritrade
And The November 27, 2020 Form 8-K**

226.    On November 23, 2020, Defendant Hynes participated in an interview with TD Ameritrade.  On November 27, 2020, Pivotal attached a copy of the transcript of that interview as Exhibit 99.1 to a Form 8-K.  Hynes stated:

> We're putting more units on the road now than any of our competitors and we've got some great customers coming back to buy more and ***we're really scaling up across the country*** and have a very low cost installation structure compared to others in the market who are trying to bring new products in.
>
> ***
>
> So we're very excited, ***we're in a great position***. Again, we are a first mover; we have gotten great feedback from our customers and our installation partners. ***Other major players in the industry for example, batteries supply, we now have multiple battery suppliers for our technology***. So it is really exciting to be closing on this transaction having plenty of capital to really execute that in scale and ***extremely rapidly in 2021 and beyond***.  [Emphasis added].

227.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

**L.    The December 11, 2020 Press Release And Form 8-K**

228.    On December 11, 2020, XL issued a press release entitled *XL Fleet Launches Pilot Program with Essential Utilities, Inc. to Electrify its Utility Fleet*.  In addition, on December 11, 2020, Pivotal attached a copy of the press release as Exhibit 99.1 to a Form 8-K signed by Ledecky and filed with the SEC. The December 11, 2020 press release stated: "XL Fleet's electrified powertrain technology is a perfect fit for companies like Essential, who are looking to ***immediately electrify their fleet vehicles***, but also have demanding drive cycles and performance requirements that need to be met," said Brian Piern, Vice President of Sales and Marketing at XL Fleet.

229.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b), (d), and (f).

**M.    The December 22, 2020 Press Release**

230.    On December 22, 2020, Pivotal issued a press release entitled *XL Fleet, a Leader in Commercial Vehicle Electrification, and Pivotal Investment Corporation II Announce Closing of Merger; XL Fleet to Trade on NYSE as 'XL'*.  The press release touted the Company's "growth strategy," "firmly established supply chain, and deep OEM relationships," and "highly scalable business model":

> "Today is a significant milestone for XL Fleet and our employees and an important step forward for the commercial vehicle industry as we transform commercial fleets to build a more sustainable world," said Dimitri Kazarinoff, XL Fleet's Chief Executive Officer. "The closing of our merger with Pivotal will empower us to ***accelerate our growth strategy*** and bolster the industry's most comprehensive fully integrated fleet electrification platform, encompassing realtime data monitoring and analytics, propriety powertrain technology, power management, charging and storage. ***Our tested products, strong presence in the U.S. and Canada, firmly-established supply chain, and deep OEM relationships position XL Fleet as the partner-of-choice*** for our blue-chip customer base who recognize us as a key

partner in helping them to meet their sustainability goals efficiently and at a lower cost."

***

"We appreciate the overwhelming support received from shareholders of Pivotal, including 99.88% votes cast in favor of the merger between Pivotal and XL Fleet," said Mr. Ledecky. "We are exceptionally proud of XL Fleet's success to date and are excited to continue to support the Company and its talented team as it transitions to the public markets. With thousands of proven systems on the road today, millions of miles driven by hundreds of customers in mission-critical applications, and an asset light, ***highly scalable business model***, I believe that XL Fleet is poised to realize its vision of becoming a world leader in fleet electrification."  [Emphasis added].

231.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(a)-(f).

### N.    Hynes' December 23, 2020 CNBC Interview

232.    On December 23, 2020, Hynes was interviewed on CNBC and was asked about the Company's growth projections and Hynes touted the Company's sales pipeline and their ability to meet the market's strong demand:

Question:    I think 2020 forecasted revenue of 21 million, 2021 75 million, but then 2024 forecasted 1.4 billion. How do you get to that number? What is your expectation in terms of some of those different levers that you just laid out for growth?

Hynes:    Well, we're growing extremely quickly; we're tripling our revenue in the middle of a pandemic, and I think we would we could have done more without the pandemic. So ***we have a great pipeline going into 2021*** and we also have a very good platform to build off of and introduce a lot more technology and product offerings. …   We're clearly leading, shipping hundreds of units per month right now. ***So we're in a great position to really expand with the market, which clearly has a lot of demand***.  [Emphasis added].

233.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(a)-(f).

### O.    The January 13, 2021 Registration Statement And January 22, 2021 Prospectus

68

234.   On January 13, 2021, the Company filed a Registration Statement on Form S-1 with the SEC and on January 22, 2021, the Company filed a related Prospectus with the SEC (the "January 22, 2021 Prospectus"), which formed part of the January 13, 2021 Registration Statement.

235.   The January 13, 2021 Registration Statement and the related January 22, 2021 Prospectus both stated:

> Revenues increased by $2.5 million, or 36.6%, from $6.9 million in the nine months ended September 30, 2019 to $9.5 million in the same period in 2020. The increase was primarily due to the ***resolution of battery supply issues***, increased end customer demand and increased order sizes. During the quarter ended September 30, 2020, ***we, along with our suppliers and OEMs, made improvements to our supply chain***, including sourcing an additional battery supplier, which helped to counteract the negative impact of the COVID-19 pandemic on our business in prior quarters. Of the $9.5 million in revenue for the nine months ended September 30, 2020, approximately $6.4 million of revenue was recognized during the three months ended September 30, 2020, which was primarily due to the resolution of battery supply issues. ***Resolving the battery supply issues allowed us to increase production and fulfill orders in our outstanding backlog***. Based upon our current production throughput and our current backlog of orders, and subject to any further ***unforeseen supply chain disruptions caused by the COVID-19 pandemic***, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.
>
> ***
>
> Revenues increased by $3.74 million, or 144.2%, from $2.59 million in the three months ended September 30, 2019 to $6.33 million in the same period in 2020. The increase was primarily due to the resolution of battery supply and in OEM vehicle production and due to increased end customer demand for our systems. ***We and our suppliers and OEMs have been making improvements in our supply chain during the second half of 2020***, including sourcing an additional battery supplier, all of which have been impacted by the COVID-19 pandemic. This third quarter revenue increase was attributable to the ***aforementioned resolution of the first and second quarter supply chain challenges***, which allowed us to ramp up production and ship an increasing number of kits to help fulfill our outstanding backlog of customer orders. ***Based upon our current production throughput, we believe that we can produce and sell more kits in the fourth quarter than in the third quarter, which we believe will enable us to fulfill even more of our outstanding backorders***. This said, it is very difficult for us to precisely gauge the impact on us, our suppliers and

our customers given the uncertainties surrounding the COVID-19 pandemic and the geo-political and economic climate. Based upon our current production throughput and its current backlog of orders, and subject to any further unforeseen supply chain disruptions caused by the COVID-19 pandemic, we anticipate revenues for the year ending December 31, 2020 to be approximately $19 million to $21 million.  [Emphasis added].

236.    The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

237.    In addition, the statements above were false and/or misleading when made because:

(a)    The statements misleadingly implied that COVID-19 was solely or principally responsible for the battery shortages experienced by XL during the first half of 2020 and failed to disclose that XL had been suffering from severe battery shortages going back to at least May 2019;

(b)    The statements failed to disclose that the battery shortages were due to XL's lack of market power and leverage in the battery market, which was unrelated to COVID;

(c)    The statements failed to disclose the severity, scope, and longstanding duration of the battery shortages; and

(d)    The statements misleadingly suggested that the battery supply issues had been "resolv[ed]" and failed to disclose that the "improvements to XL's supply chain" were insufficient to secure enough batteries for the massive expansion of production that was contemplated by XL's revenue forecast for 2021.

**P.    The March 8, 2021 Press Release**

238.    On March 8, 2021, the Company issued a press release responding to Muddy Water:

In fact, ***XL Fleet's management team has a track record of successfully navigating global supply chain challenges*** and a highly competitive operating environment. For example, in 2019, XL Fleet, as well as major vehicle manufacturers, were impacted by a component shortage that affected battery supply. ***XL Fleet has since established a more robust and reliable supply chain***,

and now has multiple battery suppliers and proprietary battery packs in place. [Emphasis added].

239.   The statements above were false and/or misleading when made because they failed to disclose the adverse facts set forth in ¶ 167(b) and (f).

240.   Further, the statements above were false and/or misleading when made because:

(a)   At the time that XL made this statement, XL was experiencing severe supply shortages that would cause XL to record only $675,000 in revenue for Q1 2021 and to withdraw its full-year revenue forecast for 2021 of $75 million.  By the time this statement was made, Q1 2021 was already more than two-thirds complete, so Defendants already knew that the supply shortages were having a material adverse effect on XL's financial results.  A little more than three weeks after XL issued this denial of the Muddy Waters allegations, XL was forced to admit that it had not able to fill any orders for "a lengthy period early in the year" due to "***ongoing OEM delays***, amid microchip and ***other shortages***."

(b)   It was misleading for XL to aggressively deny Muddy Waters' allegations that XL suffered from serious supply chain problems at the very moment that XL was in the middle of a production shutdown due to supply chain problems.

(c)   The context of Muddy Waters' allegations rendered XL's statements particularly misleading.  Muddy Waters had claimed that XL "had significant supply chain woes indicative of a bit player" and that "XL has been subject to supply shortages for years." XL responded by claiming it had "a track record of successfully navigating global supply chain challenges" and that, notwithstanding battery supply problems in 2019, XL had "since established a more robust and reliable supply chain."

## THE TRUTH BEGINS TO EMERGE

241.   On March 3, 2021, Muddy Waters published a report entitled *XL Fleet Corp. (NYSE: XL): More SPAC Trash*, alleging that salespeople "were pressured to inflate their sales pipelines" and that "customer reorder rates are in reality quite low" due to "poor performance and regulatory issues."  Citing interviews with former employees, the report alleged that "at least 18 of 33 customers XL featured were inactive." The report stated:

XL MANAGEMENT SYSTEMATICALLY INFLATES THE COMPANY'S BACKLOG

XL claims a backlog of $220+ million. This number is key to XL's sales projections, appearing twice in XL's SPAC slide deck. However, our conversations with former employees suggest XL's "pipeline" is a fiction created under pressure from senior managers. We understand that the rot emanates from XL management, who further embellished their employees' already exaggerated pipeline entries.

* * *

XL'S CLAIMED CUSTOMER BASE APPEARS GROSSLY OVERSTATED
Below is XL's stated customer list, which includes 33 logos.[] Former employees told us that many of these had not ordered vehicles for a long time. In a March 2, 2021 appearance on CNBC with Jim Cramer, XL CEO Tod Hynes deflected a question about whether its customers include some of the names below.



* * *

WE UNDERSTAND FROM FORMER EMPLOYEES THAT AT LEAST 18 OF 33 CUSTOMERS XL FEATURED WERE INACTIVE

The list shrinks by over half after removing reportedly inactive customers:

Diverse Base of Customers Operating Over 1 Million Vehicles Globally

* * *

**NUMEROUS XL CUSTOMERS REPORTEDLY HAVE NOT REORDERED DUE TO POOR PERFORMANCE AND REGULATORY ISSUES**

We believe that XL's high customer attrition rate stems from XL's lack of engineering edge, its misleading efficiency claims, and its substantial issues with regulatory approval. [footnote omitted]

*"Almost no one reorders... it's maybe 10%. To get your order in the first place, it's a months and months wait, you're angry, and then the thing doesn't work as promised. '6% improvement for $15,000? We're not going to buy any more of these things.'"* – Former XL Employee A.  [Emphasis in original].

242.    Muddy Waters also alleged that while XL Fleet "claims that its technologies leads to 25%+ MPG gains," in reality "fleet savings are generally only 5% to 10%, and are sometimes negative."  It stated:

**XL SEEMINGLY DOES NOT ACHIEVE STATED MPG GAINS OR GENERATE CLAIMED ROIs FOR CUSTOMERS**

There are two elements to XL's misrepresentations to its customers – exaggerated mileage gains and aggressive ROI modeling assumptions. Based on our conversations with former XL employees, we conclude that the company's technology seldom – if ever – generates the advertised 25-50% fuel savings. We estimate the savings is really only 5% - 10%. Three former employees told us that they were instructed to cherry-pick customer information from XL's quarterly performance reports in order to exaggerate the technology's effectiveness, while blaming inadequate MPG savings on the customers' drivers. Similar to the fuel efficiency exaggeration, XL appears to routinely pad ROI calculations to prospective customers. We believe that XL inflates ROIs primarily by using

unrealistically high gas prices and vehicle service life. We believe that the actual ROI XL's customers generate on average is *NEGATIVE*.

\* \* \*

WE UNDERSTAND THAT FLEET-WIDE SAVINGS ARE GENERALLY ONLY 5% to 10%, AND ARE SOMETIMES NEGATIVE

Reality seems to fall well short of what XL claims. We understand that fleets generally received only 5- 10% MPG efficiency gains and negative ROI.

*"Their numbers are based upon a bare-boned F-150 on a dyno [dynamometer] in optimal, optimal circumstances, but the second you add weight or a passenger or human error to that, it all goes out the window."* – Former XL Employee A

*"The things that it doesn't cover is climbing hills; the simulation is all flat... Every time you take a turn, you're expending energy to make that turn. Those are real-world situations it doesn't simulate."* – Former XL Employee F

*"If you were in the exact drive cycle that was optimal for those vehicles, a city drive cycle with very much stop and go and little idling, you did get 25%. But that drive cycle was applicable to probably 15% of vehicles that they installed systems on. If you were purchasing a system and weren't in that city drive cycle, your savings were ... Probably between 5 - 10%... definitely not 25%."* – Former XL Employee I

*"It's like a Formula One circuit; you're cornering these turns and trying to optimize the levels of throttle and brake. You try to make sure during your throttle up that you take as much power from the hybrid battery pack as possible. You start this drive when a full battery... A lot of the parameters don't really match what you'd see in a real road scenario."* – Former XL Employee G

XL'S PLUG-IN HYBRID ALSO SIGNIFICANTLY UNDERPERFORMS XL'S EFFICIENCY CLAIMS

XL's underperformance applies not only to its conventional hybrid product, but extends to its newer plugin hybrid as well.

*"The [plug-in hybrid] ones they did have out, they claimed a 50% increase in miles per gallon, the most any of them got were 35-40%.... average was 25-35%."* – Former XL Employee B

*"Never would you come across 50% on the plug-in... The 50%, it's insane that it's advertised... You might see a decrease in MPG because you're adding 800 pounds of batteries to the back of an F-150 and expecting it to achieve performance."* – Former XL Employee A

XL CHERRY-PICKED DATA AND BLAMED MPG MISSES ON DRIVERS

We found that XL encouraged its employees to present a highly manipulated set of metrics to customers to demonstrate MPG savings; or, barring that, XL employees blamed fleet drivers for not understanding the technology.

*"I gave dozens of... presentations to fleet managers, generated out of XL Link, the onboard telematics system in each vehicle with XL technology. What this report indicates, is either no improvement in MPG, slight improvement in MPG, or a loss of overall MPG. Keep in mind these kits are $25,000 each, add 750 lbs of curb weight, and take up very valuable bed space, and advertise up to 50% improvement. I would highlight their drivers' errors, such as idle time, driving over the ideal speed, and aggressive acceleration habits, just to assign blame elsewhere for no improvement in MPG. I would also falsify their fuel cost per gallon, behind what's visible to the customer, to try and prove some ROI."* — XL Former Employee A

*"My customers that had the system wanted access to XL Link. But... salespeople had to give them presentations because they tried to pretty it up to avoid, "Hey, you're only getting another mile per gallon and it's not what we promised." They would never let the customer have access to the raw data on that: we had to put it into a presentation to give to them."* — Former XL Employee B.  [Emphases in original].

243.   Muddy Waters also claimed that XL has "weak technology" and that "XL's announcement of future class 7-8 upfits seems highly promotional" because the task is "too technologically complex for XL engineers to deliver on the promised timeline." The report stated:

XL LACKS THE SUPPLY CHAIN AND PROPRIETARY TECHNOLOGY FOR EFFECTIVE FULL ELECTRIFICATION

Since XL has outsourced the manufacturing of almost all its components, this seemingly makes it substantially more difficult for it to design full-EV upfits, which are more complicated and costly.

*"XL was not vertically integrated at all, most everything was outsourced, so, it'd be very difficult for me to see them having the core competencies to develop a full EV... It's not like XL is going to crack the code on that; many have tried and few have succeeded. I am very bearish on their ability to do that."* — Former XL Employee D

*"I think any company of that kind of size that's not building full vehicles would have a hard time competing with Ford... if they had experience like Tesla did or something, that would be a different story."* – Former XL Employee F

*"There's a lot of people making those moves [into EV] right now. There's some pretty fierce competition that will lead to some interesting tech. As an installer, I think that's good. Does XL have something of true value, a patent on something? I can say, probably not... I don't see a meaningful reason why XL will be around in ten years. But in the meantime, they're there and I use them."* – Current XL Upfitter

*"One of their main flaws is the way the systems are assembled—they have all these parts they hand assemble at a small facility in Illinois... It's cute when Harvard is in your backyard and you want to deliver them a van, but the process they have right now is not scalable."* — Former XL Employee C

\* \* \*

## XL'S ANNOUNCEMENT OF FUTURE CLASS 7-8 UPFITS SEEMS HIGHLY PROMOTIONAL

In its revenue projections, which we view as extremely aggressive, XL has stated it intends to create hybrid and EV upfits for vehicles that are much heavier than the ones it has historically serviced. This is a task that former employees described flatly as too technologically complex for XL engineers to deliver on the promised timeline, which starts as soon as late 2021:

*"You need a large enough electric motor to help propel that vehicle, and for that, you need a larger battery. Soon enough, the battery becomes heavier than the vehicle... They really lose it in those plug-in pickup trucks. It works okay for the [Ford] Transits because they're lightweight anyway, but once you start getting to your pickup trucks, any weight past the stock factory body, your numbers go to shit."* – Former XL Employee A

*"Electrification does get more difficult the larger the vehicle. It's not that the ability isn't there, because the EV possesses a lot of torque, providing the ability to get the weight moving. It's the amount of energy that is required to move that much weight. That is why companies like Nikola are looking at hydrogen fuel cell technology over straight electric."* – Former XL Employee B

*"Electrification of semis is not a good choice today because you need a huge battery with 600-800 kWh, which even at very, very low prices is approximately 100-150% of the base cost of a Class 8 truck."* – EV Industry Employee

## XL'S EV/HYBRID GARBAGE TRUCK APPEARS TO BE A DISTRACTION WITH LIMITED POTENTIAL

Despite the severe limitations of the XL platform, XL has announced it intends to make hybrid and EV garbage trucks. We believe this announcement is promotional rather than promising, since refuse trucks are some of the least suitable vehicles to

EV-upfit due to their immense weight and highly variable route lengths. [footnote omitted]

*"For garbage trucks, it will never work with the path they have to take and the payload they take... Refuse trucks are built for payload, because they want the truck to run as long as possible because of transfer station cost, mileage, etc. This means a truck with the same payload capacity has very different travel distances based on how long a route needs to be prior to full payload capacity... Refuse trucks have a lot more bells and whistles that will need electricity / power at all times, not just when the vehicle is moving. They include hydraulic systems, internal PLCs and controls, safety / camera equipment, etc."* – Former XL Employee G

*"I think they're probably trying to find a niche. School buses are done [by competitors]. Box trucks are done."* – Former XL Employee A.

## DUTIES OF THE DIRECTOR DEFENDANTS

244.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

245.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

246.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)        ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)        conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)        properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)        remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

247.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

248.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DEMAND REFUSED

249.    On September 15, 2021, Plaintiff's counsel sent Defendant Frodl a demand letter requesting that the Board investigate and commence legal proceedings against certain former and/or current directors, executive officers and agents of the Company for breach of fiduciary duties and corporate waste.  *See* Exhibit A attached hereto.

250.    On October 20, 2021, Plaintiff's counsel received a response from XL Fleet's counsel acknowledging that the Board received the September 15, 2021 demand letter and that the Board had scheduled a meeting to discuss the allegations in the September 15, 2021 letter.  *See* Exhibit B attached hereto.

251.    As of the filing of this complaint, Plaintiff's counsel has not received further communications from XL Fleet's counsel regarding the September 15, 2021 letter.

252.    On February 17, 2022, the Honorable Lorna G. Schofield, District Court Judge of the Southern District of New York, issued an Order (D.E. 97), denying the defendants' motion to dismiss in the Securities Class Action.  Attached hereto as Exhibit C.

253.    The Order (D.E. 97) in the Securities Class Action held:

The Complaint alleges that five categories of statements by Defendants were false. At least one of these categories -- statements about XL Fleet's sales pipeline and revenue projections -- is sufficiently alleged and warrants denial of the motion to dismiss. That category, but not the others, is discussed below.  [*See* Order (D.E. 97) at 6]

***

The Complaint alleges that the following statements regarding XL Fleet's sales pipeline and revenue are misleading, as well as other statements on other topics. A September 18, 2020, press release issued by Pivotal and Hybrids, states that "XL has strong demand momentum with a $220 million 12-month sales pipeline and forecasted revenue of over $21 million in 2020 and $75 million in 2021." On a September 18, 2020, call to discuss the merger between Pivotal and Hybrids, Kazarinoff stated "[w]e have a 12-month rolling sales pipeline of more than 220 million dollars in potential new business opportunities." The October 2, 2020, Registration Statement, which was signed by Ledecky, Brady and Griffin, and filed with the SEC, includes the $21 million and $75 million expected revenue figures. An October 26, 2020, press release, which was also attached to a Form 8-K signed by Ledecky and filed with the SEC, makes the same claims regarding XL Fleet's sales pipeline and forecasted revenue. On an October 26, 2020, webinar, Kazarinoff announced a sales pipeline of over $240 million. On November 12, 2020, Pivotal filed an amendment to the October 2, 2020, Registration Statement, which states that XL management uses the sales and marketing team's sales tracking data to create "projections about future aggregate sales pipeline opportunities." The amendment also states that "XL management reviews its sales opportunity pipeline data and applies its historic conversion rates of sales pipeline and historical experience with respect to lead time to create revenue projections." On November 12, 2020, XL Fleet issued a press release, which was filed with the SEC by Pivotal, reverting to the $220 million 12-month sales pipeline figure.  [*id.* at 7, 8]

The Complaint alleges that these statements were misleading because they failed to disclose that XL Fleet's pipeline was materially overstated due to data manipulation by XL management in the following ways. Piern regularly instructed employees to record sales opportunities without a reasonable basis, record inflated percentage likelihoods of sales and maintain pre-existing entries in the records after customers indicated that they would not order XL Fleet's products. According to one former employee, in late 2019, Piern directed the employee to enter sales opportunities

from companies after an initial general conversation that lacked detail to expect any orders, and to enter sales opportunities even if the employee had not spoken to anyone at the company recorded and regardless of whether those companies had vehicles compatible with XL Fleet products. The Complaint alleges that another former employee recounted being instructed by Piern in the third quarter of 2020 to record a sales opportunity for a single year, even though the customer had stated that any purchase would be spread out over a multiple year period. The former employee also stated that sales opportunities were recorded with a 25% likelihood merely because XL Fleet transmitted pricing information to a customer, even if that customer had not expressed interest. The former employee believes this

and other practices overstated the sales pipeline. The Complaint alleges that a third former employee recounted that Piern artificially inflated the probability of sales figures by altering the employee's judgments of the likelihood of a sale from 25% up to 75%.  [*id.* at 8]

The aforementioned allegations sufficiently plead with particularity that the sales pipeline and revenue figures were misleading. First, the Complaint alleges, with particularity, facts showing that the pipeline figures were exaggerated and inflated without sufficient basis. Second, the Complaint alleges that the statement explaining the methodology for the pipeline and revenue forecasting, that it was keyed to historical conversion rates, was misleading. Defendants' arguments to the contrary are unavailing.  [*id.* at 8, 9]

***

The Complaint also alleges that XL Fleet stated that its revenue projections were based on historical conversion rates, although they were actually based on manipulated data. Further, one former employee states that she disclosed the overstated sales pipeline to Pivotal's attorneys during the diligence process for the merger.  [*id.* at 12]

These allegations make the inference that Defendants intentionally or recklessly misled the behavior more compelling than an inference that Defendants acted non-culpably.  At the least, the November 12, 2020, statement that XL Fleet's revenue projections were based on historical conversion rates coupled with the multiple alleged instances of projections based on manipulated data and the reporting of manipulation by a former employee to Pivotal lawyers sufficiently alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate," *Set. Cap. LLC*, 996 F.3d at 79.  [*id.* at 12]

The Complaint's allegations that Pivotal directors, including Ledecky, Griffin and Brady, were substantially involved in conducting due diligence into XL Fleet, including its financial projections, supports a finding of conscious misbehavior or recklessness as to those three individuals. The Complaint's allegations that Piern reported directly to Hynes and Kazarinoff, that they worked directly with Piern on setting sales targets and projecting sales, and had intimate knowledge of XL Fleet's

operations, including its sales projections, support a finding of scienter as to Hynes, Kazarinoff and Piern.  [*id.* at 12].

254.    The plaintiffs' claims in the Securities Class Action have been sustained on a motion to dismiss under the heighten pleading requirement under the Private Securities Litigation Reform Act, but the Board has failed to act in response to Plaintiff's September 15, 2021 demand letter.

## COUNT I

**(Against Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern for Violations of Sections 10(b) and 21D Of The Exchange Act)**

255.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

256.    The Company, along with Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Actions for these violations of law, the Company's liability will be in whole or in part due to Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern's willful and/or reckless violations of their obligations as officers and directors of the Company.

257.    Through their positions of control and authority as officers of the Company, Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

258.    As such, Defendants Ledecky, Brady, Griffin, Hynes, Kazarinoff, and Piern are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section

21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT II

### (Against the Individual Defendants for Breach of Fiduciary Duty)

259.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

260.    The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

261.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

262.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to estimate its reserves set aside for annuity and pension payments, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

263.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

264.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

265.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

266.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

267.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

268.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing the Individual Defendants' unlawful actions.

269.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

270.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

### (Against The Individual Defendants For Unjust Enrichment)

271.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.   During the Relevant Period, the Individual Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company. The Individual Defendants were unjustly enriched thereby.

273.   To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

274.   The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

275.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT V

### (Against The Individual Defendants for Abuse of Control)

276.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

278.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

279.    The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

280.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to the Company restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 22, 2022

**LAW OFFICE OF MICHAEL P. UTKE, LLC**

By: *Michael P. Utke*
     Michael P. Utke
P.O. Box 360
Pepperell, MA 01463
Telephone: (617) 314-6600
Email: mutke@utkelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*