## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VAL KAY, Derivatively on Behalf of Nominal Defendant XL FLEET CORP., <br><br> Plaintiff, <br><br> v. <br><br> DEB FRODL, ERIC TECH, KEVIN GRIFFIN, CHRIS HAYES, JOHN LEDECKY, SARA SCLARSIC, JOHN MILLER, H.R. BRADY, DIMITRI KAZARINOFF, THOMAS J. HYNES III, AND BRIAN PIERN, <br><br> Defendants, <br><br> and <br><br> XL FLEET CORP., <br><br> Nominal Defendant. | Case No. 1:22-cv-10977-NMG <br><br> Hon. Nathaniel M. Gorton |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

III.   LEGAL STANDARDS FOR FEE AND EXPENSE AWARDS ................................... 3

IV.   ARGUMENT ........................................................................................................... 4

      A.    The Substantial Benefits Obtained Demonstrate that the
            Fee and Expense Amount is Fair and Reasonable .................................... 4

            1.  Appointment of One New Independent Director .......................... 5

            2.  Enhancements to the Audit Committee .......................................... 6

            3.  Enhancements to the Compensation Committee .......................... 7

            4.  Enhancements to the Recoupment Policy ...................................... 8

            5.  Formalization of the Investment Committee ................................. 9

            6.  Lead Independent Director ........................................................ 10

            7.  Director Education .................................................................... 10

      B.    Awards in Comparable Shareholder Derivative
            Settlements Support that the Requested Fee and Expense
            Amount is Fair and Reasonable ........................................................... 11

      C.    Plaintiffs' Counsel Provided High Caliber
            Representation, Supporting the Fee and
            Expense Amount as Fair and Reasonable ............................................. 14

      D.    The Complexity and Duration of the
            Derivative Matters Support that the
            Fee and Expense Amount is Fair and Reasonable ............................... 15

      E.    Plaintiffs' Counsel Bore Significant Contingency Risk,
            Supporting the Fee and Expense Amount as Fair and Reasonable .................. 15

      F.    The Time and Effort of Plaintiffs' Counsel
            Support that the Fee and Expense Amount is Fair and Reasonable .................. 16

V.    THE SERVICE AWARDS SHOULD BE APPROVED ............................................. 19

VI.   CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

*Bettencourt v. Jeanne D'Arc Credit Union et al.*,
　2020 U.S. Dist. LEXIS 106469 (D. Mass. Jun. 17, 2020)....................................................18

*Bezdek v. Vibram U.S.A. Inc*,
　79 F. Supp. 3d 324 (D. Mass. 2015) ...............................................................................18, 20

*Boeing Co. v. Van Gemert*,
　444 U.S. 472 (1980)................................................................................................................3

*Bredbenner v. Liberty Travel, Inc*.,
　2011 U.S. Dist. LEXIS 38663 (D.N.J. Apr. 8, 2011) ...........................................................20

*City of Detroit v. Grinnell Corp.*,
　495 F.2d 448 (2d Cir. 1974)..................................................................................................15

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Foley*,
　No. 2020-0650- KSJM (Del. Ch. June 21, 2022) ............................................................6, 11

*Cnty. of York Employees Retirement Plan et al. v. Jung*,
　Index No. 651304/2010 (N.Y. Sup. Ct.-N.Y. Cnty. Aug. 1, 2016)........................................13

*Cohn v. Nelson*,
　375 F. Supp. 2d 844 (E.D. Mo. 2005)..................................................................5 n. 6, 16, 19

*Ford v. Takeda Pharmaceuticals U.S.A., Inc.*,
　2023 WL 3679031 (D. Mass. Mar. 31, 2023) ......................................................3, 15, 16, 19

*Hill v. State St. Corp.*,
　2014 U.S. Dist. LEXIS 179702 (D. Mass. Nov. 26, 2014)...................................................18

*Hollywood Firefighters' Pension Fund v. Malone*,
　2021 Del. Ch. LEXIS 264 (Del. Ch. Nov. 8, 2021) ............................................................11

*In re Activision Blizzard, Inc. S'holder Litig.*,
　124 A.3d 1025 (Del. Ch. 2015).............................................................................................12

*In re Alphatec Holdings, Inc. Derivative Shareholder Litigation*,
　Case No. 37-2010-00058586 (Cal. Super. Ct.-San Diego Cnty. Aug. 18. 2014).............12-13

*In re AOL Time Warner S'holder Derivative Litig*.,
　2009 U.S. Dist. LEXIS 124372 (S.D.N.Y. Nov. 9, 2009)....................................................16

*In re Apple Computer, Inc. Deriv. Litig.*,
　2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008)......................................................4

*In re Ashanti Goldfields Sec. Litig.*,
　2005 U.S. Dist. LEXIS 28431 (E.D.N.Y. Nov. 15, 2005)....................................................14

*In re Atmel Corp. Derivative Litig.*,
    2010 U.S. Dist. LEXIS 145551 (N.D. Cal. Mar. 31, 2010) ................................................. 12

*In re Biopure Corp. Derivative Litig.*,
    2009 WL 10692661 (D. Mass. July 24, 2009) ............................................................... 3 n. 4

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D.197 (D. Me. 2003) ................................................................................ 16-17

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    292 F. Supp. 2d 184 (D. Me. 2003) ....................................................................... 19-20

*In re CoreCivic, Inc. Shareholder Derivative Litigation*,
    No. 3:16-CV-03040 (M.D. Tenn. Dec. 2, 2022) ................................................................. 13

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    2012 U.S. Dist. LEXIS 174711 (D. Mass. Dec. 10, 2012) .................................................. 18

*In re Fab Universal Corp. S'holder Deriv. Litig.*,
    148 F. Supp. 3d 277 (S.D.N.Y. 2015) ................................................................... 15, 19

*In re Healthcare Servs. Grp., Inc. Deriv. Litig.*,
    2022 U.S. Dist. LEXIS 134005 (E.D. Pa. July 27, 2022) .................................................. 15

*In re Oracle Sec. Litig.*,
    852 F. Supp. 1437 (N.D. Cal. 1994) ............................................................................. 4

*In re Rambus Inc. Derivative Litig.*,
    2009 U.S. Dist. LEXIS 131845 (N.D. Cal. Jan. 20, 2009) ................................................. 4

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
    630 F. Supp. 3d 241 (D. Mass. 2022) ...................................................... 15-16, 18-19

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005) .............................................................................. 3, 19

*In re Rite Aid Corp Sec. Litig.*,
    196 F.3d 294 (3rd Cir. 2005) ...................................................................................... 19

*In re Southern Co. S'holder Deriv. Litig.*,
    2022 U.S. Dist. LEXIS 106456 (N.D. Ga. Jun. 9, 2022) .................................................. 12

*In re TerraForm Power, Inc. Derivative Litigation*,
    C.A. No. 11898-CB (consol.) (Del. Ch. Dec. 19, 2016; Dec. 30, 2016) ......................... 11-12

*In re Thirteen Appeals Arising out of the San Juan Dupont Plana Hotel Fire Litig.*,
    56 F.3d 296 (1st Cir. 1995) ................................................................................ 16, 17

*In re Tile Shop Holdings, Inc. S'holder Deriv. Litig.*,
    C.A. No. 10884-VCG (Del. Ch. Aug. 23, 2018) ............................................................. 11

*In re Tyco Int'l, Ltd.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) ................................................................. 17, 19

*In re Warner Commc'ns Sec. Litig.*,
  618 F. Supp. 735 (S.D.N.Y. 1985),
  *aff'd*, 798 F.2d 35 (2d Cir. 1986) ........................................................................ 14

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ................................................................................. 3

*Mills v. Elec. Auto-Lite.*,
  396 U.S. 375 (1970) ............................................................................................ 3, 4

*Nixon-Crenshaw v. Coley*,
  No. 18-cv-25289-AHS (S.D. Fla. Sep. 30, 2021) ................................................ 13

*S'holder Representative Servs. LLC v. Shire US Holdings, Inc.*,
  2021 Del. Ch. LEXIS 81 (Del. Ch. Apr. 27, 2021) ............................................. 19

*Scovil v. FedEx Ground Package Sys., Inc.*,
  2014 U.S. Dist. LEXIS 33361 (D. Me. Mar. 14, 2014) ...................................... 19

## Other Sources

Beasley, Branson & Hancock, *2015 Report on the Current State of Enterprise Risk Oversight: Update on Trends and Opportunities,* Raleigh: Am. Inst. of Certified Public Acct./N. Carolina St. U. (6th ed. 2015) ............................................................................................... 6

CalPERS's Governance & Sustainability Principles ...................................... 6, 6 n. 7

L. Bebchuk & A. Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009) .......................................................................... 4-5, 6

M. Farrell & R. Gallagher, *The Value Implications of Risk Management Maturity*, 82 J. of Risk and Insurance 3 (2015) ....................................................................................... 6

*McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000) ..... 5 n. 5

Robert Adamson, *Corporate Governance, Risk Management and Corporate Social Responsibility in Emerging Markets: A Symbiotic Relationship*, Corporate Governance & Risk Management Blog, Simon Fraser University, Beedie School of Business (Mar. 22, 2011) ...... 5

In connection with the final approval of the Settlement,[1] Plaintiff Val Kay ("Plaintiff"), through his undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for an Award of Attorneys' Fees, Expenses, and Service Awards.[2]  By this Motion, Plaintiff requests a Fee and Expense Amount in the amount of $2,500,000 to collectively compensate all Plaintiffs' Counsel for the substantial benefit their services produced for the Company, reimburse their reasonably incurred litigation expenses, and approve Service Awards of $2,000 to each of the Plaintiffs, which will be paid out of the Fee and Expense Amount.

## I.      INTRODUCTION

As detailed in the Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Settlement ("Final App. Memo"), the Settlement confers substantial benefits upon XL Fleet Corp. ("XL Fleet," "Spruce Power," or the "Company").  These substantial benefits warrant approval of Plaintiffs' Counsel's requested Fee and Expense Amount of $2,500,000.

The Settlement is comprised of corporate governance reforms ("Reforms") that directly address the alleged wrongdoing at issue in the Derivative Matters by enhancing the Board's independence, enhancing oversight over the Company's public disclosures and the Company's mergers and acquisitions ("M&A"), improving the Company's compensation and recoupment policies, and helping to shape the Company's culture to one focused on integrity and compliance.  Among other things, the Reforms: (i) require that the Board appoint one new independent director; (ii) enhance the Audit Committee's oversight over the Company's public disclosures, compliance, and internal risk assessment, including by enhancing reporting among

---

[1]      Unless otherwise noted, all capitalized terms herein shall have the same meaning as set forth in the Stipulation of Settlement dated March 1, 2024 (ECF No. 68-1, Ex. 1, "Stip.").

[2]      The Settlement will resolve this Action (the "Massachusetts Action"), the Delaware action entitled *In re Spruce Power Holding Corp. S'holder Derivative Litig.*, Case No. 1:23-cv-00289-MN (D. Del.), and the Litigation Demand, which are collectively referred to as the "Derivative Matters." Plaintiff Kay, Plaintiffs Tony Reali and John Tucci in the Delaware Action, and stockholder Claude Patterson are collectively referred to as "Plaintiffs."

management, the Audit Committee, and the Board; (iii) require that the Compensation Committee annually retain an independent consultant to conduct an assessment of the Company's current incentive and compensation structures; (iv) enhance the Compensation Committee's oversight over annual short-term compensation, as well as termination benefits and separation pay; (v) enhance the Company's Recoupment Policy to ensure the Company can recoup incentive compensation in the event of a financial restatement occurring or where Company personnel engage in serious misconduct; and (vi) formalize an Investment Committee, which will provide increased oversight of the Company's M&A opportunities and related disclosures. *See* Stip., Ex. A. Collectively, these Reforms, among others detailed in Exhibit A of the Stipulation, will confer immediate and lasting value upon the Company.

The Company has acknowledged that the "Derivative Matters were a precipitating, substantial, and material factor in the Board's adoption and implementation of the Reforms." Stip., Ex. A at 1. In addition, the Company acknowledges that "[the Reforms] confer substantial benefits upon [the Company]," *id*., and that resolving the Derivative Matters upon these terms is in "best interest of the Company and its stockholders." Stip. § III.

As detailed herein, the requested Fee and Expense Amount of $2,500,000 is fair, reasonable, and justified in light of the substantial benefits conferred on the Company through the Reforms, and is appropriate given the complexity of the matter, the exemplary results achieved in the face of significant litigation risks, and the substantial time and expenses Plaintiffs' Counsel invested on a fully contingent basis. Thus, Plaintiff respectfully submits that the requested Fee and Expense Amount is fair and reasonable and should be approved.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

A detailed background of the facts and procedural history of the Derivative Matters are set forth in the Declaration of Thomas J. McKenna ("McKenna Decl."), filed herewith, as well

as in the Final App. Memo., together with the Declaration of Thomas J. McKenna in Support

of Plaintiff's Motion for Final Approval of Settlement ("McKenna Final App. Decl.").

### III.    LEGAL STANDARDS FOR FEE AND EXPENSE AWARDS

Under the substantial benefit doctrine, counsel who prosecute a derivative action that

confers substantial benefits on a corporation through corporate therapeutics are entitled to an

award of attorneys' fees and costs.  *See Mills v. Elec. Auto-Lite*., 396 U.S. 375, 395-96 (1970);

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *see also Maher v. Zapata Corp.*, 714 F.2d 436,

461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a

substantially greater economic impact on it, both long- and short-term, than the dollar amount

of any likely judgment").

When determining the reasonableness of a fee award, courts in the First Circuit

typically consider: (i) benefits achieved in the action, (ii) the presence or absence of substantial

objections;[3] (iii) counsel's skill, standing, and ability; (iv) the complexities of the litigation;

(v) the financial risks of non-payment (*i.e.*, the contingent nature of the fee); (vi) the time

devoted by counsel; and (v) the awards in similar cases.  *See Ford v. Takeda Pharmaceuticals*

*U.S.A., Inc.*, 2023 WL 3679031, at *1 (D. Mass. Mar. 31, 2023) (quoting *In re Relafen Antitrust*

*Litig.*, 231 F.R.D. 52, 79-81 (D. Mass. 2005).[4]  Plaintiff respectfully submits that a review of

these factors supports approval of the requested Fee and Expense Amount.

---

[3]     The deadline object to the Settlement, including the Fee and Expense Amount, is July
10, 2024.  To date, counsel has not heard from any shareholder indicating that they are not
satisfied with this Settlement.  Any subsequent objections will be addressed in briefs to be filed
on July 24, 2024.

[4]     *See In re Biopure Corp. Derivative Litig.*, 2009 WL 10692661, at *2 (D. Mass. July 24,
2009) (applying class action standards to approval of shareholder derivative settlement).

## IV.     ARGUMENT

### A.     The Substantial Benefits Obtained Demonstrate that the Fee and Expense Amount is Fair and Reasonable

It is undisputed that "a corporation may receive a 'substantial benefit' from a derivative action, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature" because "corporate therapeutics" can "furnish a benefit to all shareholders." *Mills*, 396 U.S. at 395-96; *In re Rambus Inc. Derivative Litig.*, 2009 U.S. Dist. LEXIS 131845, at *11 (N.D. Cal. Jan. 20, 2009) ("Following *Mills*, courts consistently have approved attorneys' fees and expenses in shareholder actions where plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief."); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445-50 (N.D. Cal. 1994) (changes in governance likely to produce economic benefits or cost avoidance are "fund creating actions" meriting fee and expense awards).

Strong corporate governance reforms, like those achieved here, provide substantial value to the Company through increased "market value" and investors who "likely will view such reforms as an additional reason to purchase the stock." *In re Apple Computer, Inc. Deriv. Litig.*, 2008 U.S. Dist. LEXIS 108195, at *10 (N.D. Cal. Nov. 5, 2008). While it would be difficult to estimate the value of these benefits with precision, they are no less real and substantial.[5] Indeed, research by academics and leading business advisors confirms that investors are willing to pay a premium for stock in companies with strong corporate governance relative to peer companies perceived to have weaker governance because strong governance correlates with long-term value. *See* L. Bebchuk & A. Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009) ("There is now widespread

---

[5]     Consulting firm McKinsey & Company has conducted studies showing that strong governance may increase a company's market capitalization by an average of approximately 18%. (*McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000), https://www.oecd.org/daf/ca/corporategovernanceprinciples/1922101.pdf). XL Fleet's current market capitalization is approximately $60 million.

acceptance that adequate investor protection can substantially affect not only the value of public firms and their performance but also the development of capital markets and the growth of the economy as a whole."); Robert Adamson, *Corporate Governance, Risk Management and Corporate Social Responsibility in Emerging Markets: A Symbiotic Relationship*, Corporate Governance & Risk Management Blog, Simon Fraser University, Beedie School of Business (Mar. 22, 2011) ("Investors, particularly large institutional investors, are … focused on corporate governance[.] … Paying attention to corporate governance issues is becoming an important part of investment decisions[.]"). *See* McKenna Decl., ¶ 26.

Here, the Settlement commits the Board to the adoption and maintenance of the Reforms for at least four (4) years.[6]  Stip., Ex. A.  The Reforms impart substantial benefits on the Company by significantly enhancing the Company's internal controls, addressing the deficiencies Plaintiffs contend allowed the alleged misconduct to occur, and further aligning the interests of the Company with those of its shareholders.  They also greatly reduce the chances of the Company suffering future legal exposure from misconduct similar to that alleged in the Derivative Matters. In sum, the Reforms provide for, among other things:

### 1.    Appointment of One New Independent Director

To create a stronger, more independent Board, the Settlement requires that the Board add one (1) new independent director to its Board, which is currently comprised of six (6) members.  *See* Stip., Ex. A at 5. A strong, independent board is critical to ensure that independent directors are actively supervising the Company's compliance, the adequacy of its internal controls, and its risk exposure. This strong, independent oversight creates substantial value for the Company, as has been repeatedly confirmed in academic research and in surveys

---

[6]     This duration will allow the Reforms to become enmeshed within the Company's policies, practices, and corporate culture. *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (corporate governance measures in place for at least three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past.").

of business leaders and institutional investors, as well as comparable cases. *See* L. Bebchuk & A. Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263 (2009); M. Farrell & R. Gallagher, *The Value Implications of Risk Management Maturity*, 82 J. of Risk and Insurance 3 (2015); Beasley, Branson & Hancock, *2015 Report on the Current State of Enterprise Risk Oversight: Update on Trends and Opportunities,* Raleigh: Am. Inst. of Certified Public Acct./N. Carolina St. U. (6th ed. 2015). "Independence is the cornerstone of accountability.  It is now widely recognized that independent boards are essential to a sound governance structure."  CalPERS's Governance & Sustainability Principles at 11.[7]  McKenna Decl., Ex. Q; *see City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Foley*, No. 2020-0650- KSJM, Tr. at 45:11-15, 51:8-12 (Del. Ch. June 21, 2022) (McKenna Decl., Ex. H) (remarking "it should be obvious to all that [this] is an excellent settlement for the company" in part because "independent directors ... improve the integrity of the board process").

### 2.      Enhancements to the Audit Committee

The Settlement requires that the Company enhance the Audit Committee's responsibilities and oversight over the Company's public disclosures, including those related to material acquisitions, enhance management's reporting to the Audit Committee regarding certain risks, and enhance the Audit Committee's reporting to the entire Board regarding material compliance issues.  *See* Stip., Ex. A at 1.

For instance, the Audit Committee will be responsible for monitoring: (i) the Company's compliance with all public reporting requirements; (ii) internal risk assessment and internal reporting, including the identification of material risks relating to the Company's

---

[7]      CalPERS refers to the California Public Employees' Retirement System ("CalPERS"), which is the "nation's largest defined benefit public pension fund." *Id*. at 1.  CalPERS publishes its "views on best practices," as it believes that "fully accountable governance structures produce, over the long term, the best returns to shareowners." *Id*. at 1, 5.  CalPERS publishes its Governance & Sustainability Principles, which set forth certain "underlying tenets that should be adopted by all companies and markets … to establish the foundation for achieving long-term sustainable investment returns." *Id*. at 5.

compliance and public disclosures about the Company's business affairs, financial reporting, projections, and risk exposure; and (iii) the accuracy of the Company's public statements, including those concerning any forecasted revenue.

To ensure the Audit Committee is adequately informed, the Reforms require the Audit Committee to meet quarterly with the Company's Chief Legal Officer, and receive quarterly presentations from management concerning certain risk-related topics, with executive leadership and external auditors present. The Audit Committee will also solicit the input of management-level representatives as necessary to review the accuracy of the Company's public disclosures, including, the Company's operations, enterprise and technology risks, compliance matters, and forecasted earnings or revenue. The Reforms also require that the Audit Committee review the Company's periodic public reports to ensure the proper disclosure of actual risks and risk factors, and to specifically review all public disclosures related to material acquisitions. The Audit Committee will report any material compliance issue, deficiency, or risk to the full Board. And all Company directors and employees, including the CEO and CFO, will be required to cooperate with Audit Committee investigations, and any failure to cooperate will be grounds for discipline and potential termination.

These reforms are designed to, among other things, promote the accurate and timely disclosure of material information by ensuring the members of the Audit Committee are adequately informed and provide thorough oversight over the Company's public disclosures, internal risk assessment, and compliance. McKenna Decl., ¶ 28.

### 3.    __Enhancements to the Compensation Committee__

The Settlement requires that XL Fleet make several improvements to its Compensation Committee Charter that enhance the Committee's responsibilities related to the Company's incentive and compensation structures and termination benefits. *See* Stip., Ex. A at 2.

The Reforms help provide independent oversight over the Company's incentive and compensation structures by requiring that the Compensation Committee annually retain an independent consultant to assess the Company's current incentive and compensation structures, and also evaluate the benefits and risks associated with tying the Company's compensation awards and targets to stock performance.  The results of this independent assessment and any recommendations therewith will be presented to the full Board, and any material changes made to the Company's compensation structure as a result will be publicly disclosed. The Settlement also enhances the Compensation Committee's oversight over annual short-term compensation by requiring the Compensation Committee to take into account the particular executive's performance as it relates to both legal compliance and compliance with the Company's internal policies and procedures. *See* McKenna Decl., ¶ 29.

In addition, when determining, setting, or approving termination benefits and/or separation pay to executive officers, the Compensation Committee will be required to take into consideration the circumstances surrounding the particular executive officer's departure and the executive's performance as it relates to both legal compliance and compliance with the Company's internal policies and procedures. *Id.* The Reforms also require that the Compensation Committee Charter be amended to reflect the enhanced Recoupment Policy described below.

### 4.    Enhancements to the Recoupment Policy

The Settlement requires that the Company significantly enhance its Recoupment Policy. *See* Stip., Ex. A at 3.  If the Company is required to prepare an accounting restatement due to material noncompliance with any financial reporting requirement, the Compensation Committee will review the incentive compensation that was paid or awarded to the Company's current and former Section 16 officers (the "Officers") during the restatement period. The Board will seek the recoupment or forfeiture of any incentive compensation paid or awarded

to any Officer that the Board of Directors determines, in its sole discretion, was in excess of the amount that would have been paid or awarded to the Officer(s) under the Company's restated financial statements.  The Compensation Committee will also be empowered, in its discretion, to recommend recoupment of any incentive compensation received or awarded to any Company employee, current or former executive officer, or Board member where the Board has determined that such individual has engaged in serious misconduct resulting in a violation of a significant Company policy, law, or regulation that causes material financial or reputational harm to the Company.  In the event of any such recoupment mentioned above, the Company will publicly disclose the amounts recouped and circumstances thereof in its next proxy statement or other filing with the SEC. McKenna Decl., ¶ 30.

These enhancements to the Recoupment Policy not only allow the Company to recoup compensation in the event of fraud or misconduct, but they also help promote the integrity and accountability of the Company's executive officers, directors, and employees.  *Id*.  More closely aligning compensation decisions with the Company's corporate objectives will promote good corporate behavior among the Company's senior executives (and disincentive bad behavior—such as the misconduct alleged in the Derivative Matters—that could expose the Company to litigation or regulatory investigations or actions.

## 5.  **Formalization of the Investment Committee**

To enhance the Company's M&A opportunities and provide increased oversight of the Company's due diligence thereof, integration efforts, and related disclosures, the Settlement requires that the Company draft a charter to formalize its Investment Committee.  *See* Stip., Ex. A at 4. This Investment Committee's Charter will reflect that, among other things: (i) the Investment Committee will be composed of at least three (3) members, including at least one (1) Board member, and at least two (2) senior members of the Company's executive team or management; (ii) the Investment Committee will meet as necessary but not less than four (4)

times annually; (iii) the purpose and function of the Investment Committee will be to assist the Board with its oversight responsibilities regarding M&A activity involving over $1 million; (iv) the Investment Committee will keep the Board apprised of its activities; and (v) the Investment Committee will be fully authorized to retain, at the Company's expense, legal, financial, and any other advisors or consultants that the Investment Committee members deem appropriate under the circumstances. McKenna Decl., ¶ 31.

In addition, to ensure the Investment Committee is adequately and timely informed regarding any potential transactions involving the Company, the senior executives and management engaged in a potential transaction will provide the Investment Committee with information about the proposed transaction from initiation through integration, including: (i) an overview of the target company; (ii) an overview of such transaction; (iii) integration plans; (iv) key agreements and terms; and (v) key financial summaries and assumptions. *Id.*

### 6. Lead Independent Director

Further enhancing director independence from management, the Reforms also provide that, in the event the CEO and Chair of the Board are the same person, the Company will have a lead independent director. *See* Stip., Ex. A at 6; McKenna Decl., ¶ 32.

### 7. Director Education

The Settlement also requires that the Company's directors participate in annual continuing education, which may be focused on any of the following topics: the Company's business and industry, committee roles and responsibilities, and legal and ethical responsibilities of directors, rules and regulations regarding public disclosures, Generally Accepted Accounting Principles ("GAAP"), the Sarbanes-Oxley Act of 2002, standards governing internal controls over financial reporting, corporate governance, fiduciary duties, assessment of risk, compliance auditing, and reporting requirements for publicly-traded corporations. *See* Stip., Ex. A at 5. These reforms will encourage all directors to remain

knowledgeable about their fiduciary duties and adequately trained on topics that are of significance importance to XL Fleet and its shareholders.  McKenna Decl., ¶ 33.

This is just a summary of the Reforms, which are detailed in Exhibit A to the Stipulation, ECF No. 68-1, Ex. 1.  Collectively, these Reforms will provide substantial, long-term benefits to the Company and its shareholders by addressing the alleged wrongdoing in the Derivative Matters and strengthening the Company's overall corporate governance practices going forward.  McKenna Decl., ¶ 34.

**B.     Awards in Comparable Shareholder Derivative Settlements Support that the Requested Fee and Expense Amount is Fair and Reasonable**

Plaintiffs' Counsel's requested Fee and Expense Amount of $2,500,000 is reasonable and compares favorably with fees awarded in other derivative settlements that resulted in governance reforms similar to those achieved for XL Fleet here.

To begin, the Company's agreement to appoint a new independent director to its Board is a notable achievement that will provide significant, long-term benefits to the Company. Courts recognize that appointing an independent director to a board confers substantial benefits that, alone, warrant attorneys' fees of at least one million dollars or more.  *In re Tile Shop Holdings, Inc. S'holder Deriv. Litig.*, C.A. No. 10884-VCG (Del. Ch. Aug. 23, 2018), Tr. at 42:8-11, McKenna Decl., Ex. G ("[I]t seemed to me that about a million dollars was a proper plaintiff firm recovery for achieving the independent director alone."); *City of Miami*, Tr. at 51:8-12 (Del. Ch. June 21, 2022) ("I think the appropriate ballpark here is $1 to 2 million for the appointment of independent directors."); *Hollywood Firefighters' Pension Fund v. Malone*, 2021 Del. Ch. LEXIS 264, *25-26 (Del. Ch. Nov. 8, 2021) ("[T]he addition of a single independent director could itself support an award of $1 million in attorneys' fees."); *In re TerraForm Power, Inc. Derivative Litigation,* C.A. No. 11898-CB (consol.) (Del. Ch. Dec. 19, 2016; Dec. 30, 2016), Tr. at 20:19-22, 21:11-16, McKenna Decl., Ex. I (awarding $3 million in attorneys' fees for achieving management and board changes, one of them "being the addition

of an independent board member, which is relief that would have been difficult for the Court to judicially order and certainly is a good thing"); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1071 (Del. Ch. 2015) ("precedent suggests that an award of $5-10 million could be justified" where non-monetary components of derivative settlement included two independent directors rendering board majority independent, among other relief); *In re Atmel Corp. Derivative Litig.*, 2010 U.S. Dist. LEXIS 145551, at *40 (N.D. Cal. Mar. 31, 2010) (awarding fee of $4.94 million for reforms that included a new independent director).

In addition to obtaining an independent director to the Board, the Settlement requires numerous additional reforms that strengthen the Company's internal controls over its public disclosures and commitment to compliance, improve its compensation and recoupment policies, increase oversight over the Company's M&A opportunities, and improve reporting among management and the Board. Courts place great value on reforms similar to those achieved here, justifying awards of substantial attorneys' fees.

For example, in *In re Alphatec Holdings, Inc. Derivative Shareholder Litigation*, Case No. 37-2010-00058586 (Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014), *see* McKenna Decl., Exs. J–K, the court awarded $5,250,000 in attorneys' fees and expenses for a governance-only derivative settlement achieved at the pleading stage.  Notably, *Alphatec* did not involve the appointment of a new independent director but the settlement did include other reforms similar to those achieved here that enhanced the Audit Committee's duties and oversight, improved director independence, required the separation of the company's CEO and Chairperson of the Board (here, the Settlement demands a Lead Independent Director if these roles are filled by the same person), enhanced oversight over the alleged weaknesses involved in that case (i.e., related-party transactions), required hiring an independent consultant, and director training.

Similarly, *In re Southern Co. S'holder Deriv. Litig.*, 2022 U.S. Dist. LEXIS 106456 (N.D. Ga. Jun. 9, 2022), the court awarded $3,500,000 in attorneys' fees and expenses for a

governance-only derivative settlement achieved at the pleading stage.  The governance reforms obtained in *Southern* enhanced the company's cost-tracking processes (which addressed alleged weaknesses in that case) and obtained additional reforms comparable to those achieved here, which enhanced the duties and responsibilities of management and board-level committees over the company's public disclosures and the internal audit process, enhanced reporting between management and the Board, improved compensation practices and the company's recoupment policy, and required director and employee education.  *See also Cnty. of York Employees Retirement Plan et al. v. Jung*, Index No. 651304/2010 (N.Y. Sup. Ct.-N.Y. Cnty. Aug. 1, 2016), McKenna Decl., Exs. L–M, (awarding $4,000,000 in attorneys' fees and expenses for a derivative settlement achieved at the pleading stage, which required governance reforms that enhanced the duties and responsibilities of the compliance committee, appointed a new compliance officer; and created a certification program regarding the Foreign Corrupt Practices Act, including related oversight and reporting requirements); *In re CoreCivic, Inc. Shareholder Derivative Litigation*, No. 3:16-CV-03040 (M.D. Tenn. Dec. 2, 2022), McKenna Decl., Exs. N–O, (awarding $3,500,000 in attorneys' fees and expenses in connection with the settlement of a shareholder derivative action that settled at the pleading stage, which required governance reforms that improved internal operations related to the Company's prison facilities (which addressed alleged weaknesses in that case); enhanced oversight by the board and management over the company's risks, quality assurance, compliance, and disclosure controls; enhanced board independence; and improved the Whistleblower Policy and Recoupment Policy); *Nixon-Crenshaw v. Coley*, No. 18-cv-25289-AHS (S.D. Fla. Sep. 30, 2021) (awarding $2,500,000 in attorneys' fees and expenses in connection with a governance-only derivative settlement that required the company to appoint a new independent director, set director term limits, enhanced the company's recoupment policy, and formalized its disclosure committee). McKenna Decl., Exs. P and P-1.

13

As reflected by the fees awarded in these derivative settlements that achieved comparable corporate governance reforms, Plaintiffs' Counsel's requested Fee and Expense Amount of $2,500,000 is fair and reasonable and should be approved.

### C. Plaintiffs' Counsel Provided High Caliber Representation, Supporting the Fee and Expense Amount as Fair and Reasonable

Courts reward attorneys who bring complex matters to a successful early resolution while also serving the interests of efficiency and judicial economy. *See In re Ashanti Goldfields Sec. Litig.*, 2005 U.S. Dist. LEXIS 28431, at *10 (E.D.N.Y. Nov. 15, 2005) ("The quality of representation factor is designed to reward particularly resourceful legal work that secures a substantial benefit ... with a minimum of time invested."). Plaintiffs' Counsel's experience and skill[8] were amply demonstrated here by their ability to coordinate their efforts across the related Derivative Matters, critically evaluate the available public and non-public documentary evidence, prepare well-supported litigation positions to generate meaningful early settlement leverage, and develop and negotiate a strong remedial package that all parties agree confers substantial benefits upon XL Fleet and its stockholders. They did so while minimizing unnecessary expenditures of resources by XL Fleet, the real party in interest, in the Derivative Matters. Following *Ashanti Goldfields*, these achievements should be adequately rewarded. 2005 U.S. Dist. LEXIS 28431, at *10.

Similarly, "[t]he quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). Defendants are represented by pre-eminent corporate defense firms that ably defended their clients' interests. McKenna Decl., ¶¶ 41. Together, these circumstances strongly weigh in favor of approving the Fee and Expense

---

[8] As reflected by their firm résumés, Plaintiffs' Counsel are highly experienced practitioners in shareholder derivative litigation, have litigated scores of shareholder derivative actions to successful resolution across the country, and are recognized as leaders in the field of shareholder rights litigation. *See* McKenna Decl., Exs. A–F.

Amount.  *See In re Fab Universal Corp. S'holder Deriv. Litig.*, 148 F. Supp. 3d 277, 284 (S.D.N.Y. 2015) ("The Settlement itself, achieved through adversarial negotiation with and litigation against highly competent and experienced defense counsel, therefore evidences that the quality of [plaintiffs' counsel's] representation is high in this case.").

     **D.**    **The Complexity and Duration of the Derivative Matters Support that the Fee and Expense Amount is Fair and Reasonable**

     The complexity and likely duration of the Derivative Matters also support the requested Fee and Expense Amount.  *See Ford*, 2023 WL 3679031 at *1; *see also* Final App. Memo. at § IV.B.3.  While Plaintiffs and their counsel believe the claims alleged in the Derivative Matters are meritorious, they are sufficiently experienced and realistic to know that ongoing litigation in multiple forums would be complex and would result in increased risks and delay in obtaining benefits for the Company.  As described in the Final Approval Memo, derivative cases are "notably difficult and unpredictable." *In re Healthcare Servs. Grp., Inc. Deriv. Litig.*, 2022 U.S. Dist. LEXIS 134005, at *14 (E.D. Pa. July 27, 2022); *see also* Final App. Memo at § IV.B.1. Despite the significant complexities of the Derivative Matters, Plaintiffs' Counsel were able to achieve a meaningful Settlement that provides immediate and substantial benefits to the Company and avoids years of delay and uncertainty, thereby supporting the requested Fee and Expense Amount.  McKenna Decl., ¶ 48.

     **E.**    **Plaintiffs' Counsel Bore Significant Contingency Risk, Supporting the Fee and Expense Amount as Fair and Reasonable**

     The Fee and Expense Amount is reasonable given Plaintiffs' Counsel's significant risk of nonpayment.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974) ("Perhaps the foremost of [the less objective] factors is the attorneys' 'risk of litigation,' *i.e.*, the fact that, despite the most vigorous and competent of efforts, success is never guaranteed."); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 630 F. Supp. 3d 241, 246 (D. Mass. 2022) ("[r]isk multipliers incentivize attorneys to represent class clients, who might otherwise be

denied access to counsel, on a contingency basis."). Plaintiffs' Counsel pursued the Derivative Matters on a fully contingent basis knowing that that they would likely devote hundreds of hours of hard work to the prosecution of a difficult cause, without any assurance of receiving any fees or reimbursement for their out-of-pocket expenses. McKenna Decl., ¶¶ 51–52. Had litigation continued, there was a very real prospect that Defendants could have defeated Plaintiffs' claims at the pleading stage or on the merits, and in turn, that Plaintiffs' Counsel efforts would go entirely uncompensated. These risks borne to obtain the benefits secured for the Company and its shareholders thus support that the requested Fee and Expense Amount is fair, reasonable, and should be approved. *See Cohn*, 375 F. Supp. 2d at 865-66 ("[I]t is imperative that the filing of contingent ... derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.... [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorney's fees awarded should reflect this goal."). The Fee and Expense Amount is also consistent with public policy. *See In re AOL Time Warner S'holder Derivative Litig.*, 2009 U.S. Dist. LEXIS 124372, at *70 (S.D.N.Y. Nov. 9, 2009) (fee award should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis").

### F.    The Time and Effort of Plaintiffs' Counsel Support that the Fee and Expense Amount is Fair and Reasonable

"In the First Circuit, a lodestar calculation is not required. Nonetheless, one may be performed as a cross-check to ensure that the [fee] award is fair and reasonable." *Ford*, 2023 WL 3679031, at *2 (citing *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 296, 307 (1st Cir. 1995)); *see also In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215-16 (D. Me. 2003). "When the lodestar is used in this way, the focus is not on the 'necessity and reasonableness of every hour' of the

lodestar, but on the broader question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys." *In re Tyco Int'l, Ltd*, 535 F. Supp. 2d 249, 270-71 (D.N.H. 2007) (quoting *Thirteen Appeals*, 56 F.3d at 307).

Plaintiffs' Counsel's substantial investments of time and expenses devoted to the Derivative Matters, and the resulting lodestar amount, supports that the requested Fee and Expense Amount is reasonable and should be approved. From inception through to April 22, 2024, Plaintiffs' Counsel devoted a total of 1,273.05 hours to the investigation of the alleged wrongdoing, issuance of litigation demands, commencement and prosecution of the litigation, and settlement of the Derivative Matters, incurring a collective lodestar of $996,720.50. *See* McKenna Decl. ¶ 57. Plaintiffs' Counsel's lodestar reflects approximately two and a half years of ongoing effort where they dedicated considerable time and resources in the investigation and prosecution of the alleged wrongdoing. This investment of time is commensurate with the challenges confronted and necessary to secure the benefits achieved for the Company.

To summarize their collective time and efforts, Plaintiffs' Counsel: (i) reviewed and analyzed the Company's press releases, public statements, and SEC filings; (ii) reviewed and analyzed media and analyst reports about the Company; (iii) reviewed and analyzed the pleadings in the related Federal Securities Action; (iv) researched the applicable federal, Massachusetts, and Delaware law with respect to the claims alleged and the potential defenses thereto; (v) prepared and served shareholder litigation demands on the Company's Board; (vi) prepared and filed the complaints in the Derivative Matters; (vii) diligently reviewed and analyzed 1,041 pages of non-public documents produced by the Company; (viii) researched and evaluated the factual and legal issues relevant to the claims; (ix) researched the Company's internal corporate governance policies, processes, and procedures in connection with the settlement efforts; (x) prepared comprehensive written settlement demands; (xi) prepared materials for and participated in the mediation and follow up negotiations; (xii) negotiated the

material terms of the Settlement, and negotiated and drafted the Memorandum of Understanding, Stipulation of Settlement, and exhibits thereto; and (xiii) prepared the motions to approve the Settlement, both preliminarily and finally. *See* McKenna Decl. ¶ 55.

In addition to their cumulative lodestar of $996,720.50, Plaintiffs' Counsel also have unreimbursed litigation costs totalling $22,451.55 which were "reasonably and necessarily incurred in prosecuting the [l]itigation." *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 2012 U.S. Dist. LEXIS 174711, at *7 (D. Mass. Dec. 10, 2012). Indeed, the expenses incurred include, *inter alia*, the costs of legal and factual research, court fees, travel, copying costs, and mediation fees (McKenna Decl. at ¶¶ 60–62), all of which are "the types of expenses that are necessarily incurred in the litigation of this type and routinely charged to clients billed by the hour." *Hill v. State St. Corp.*, 2014 U.S. Dist. LEXIS 179702, at *53-54 (D. Mass. Nov. 26, 2014); *see Bezdek v. Vibram U.S.A. Inc.*, 79 F. Supp. 3d 324 (D. Mass. 2015) (approving reimbursement of expenses that included, among other things, "costs associated with mediation, legal research, filing fees, consultation with experts, photocopying, and travel to hearings, depositions, and meetings").

Thus, the total requested Fee and Expense Amount of $2,500,000 represents a 2.43 multiplier on Plaintiffs' Counsels' lodestar.[9] McKenna Decl. ¶ 63. This multiplier is unquestionably reasonable, especially given the substantial benefits achieved, and is well within the range of multipliers approved in other securities and derivative litigation. *See Bettencourt v. Jeanne D'Arc Credit Union et al*., 2020 U.S. Dist. LEXIS 106469, at *7 (D. Mass. Jun. 17, 2020) (Gorton, J.) (noting that "the range of multipliers typically allowed by this Court" is 1x to 2.7x); *In re Ranbaxy*, 630 F. Supp. 3d at 247 ("The typical range of the lodestar multiplier allowed by this Court is between one and 2.7.  Most multipliers fall between

---

[9]     The lodestar here is inclusive of attorneys' fees and unreimbursed litigation expenses, plus the $8,000 in proposed total Service Awards, which equals $1,027,172.05.

one and four, although there is significant variation."); *Relafen*, 231 F.R.D. at 82 (approving a multiplier of 2.02) (citing *Vizcaino*, 290 F.3d at 1051 n.6) (citing *In re Rite Aid Corp Sec. Litig.*, 196 F.3d 294, 298-99, 303-04 (3rd Cir. 2005) (finding no abuse of discretion where district court approved attorneys' fees with a "fairly common" lodestar multiplier of 4.07, despite objection that lodestar multiplier could not be above 3).

*See also Tyco*, 535 F. Supp. 2d, at 271 (applying a lodestar multiplier of 2.697); *Ford*, 2023 WL 3679031 at *2 (approving fees that amounted to a lodestar multiplier of 2.41 and finding that "[t]o compensate for the risk of non-payment and to reflect the scale of the results achieved by prevailing counsel, a multiplier of the lodestar rate may be used"); *S'holder Representative Servs. LLC v. Shire US Holdings, Inc.*, 2021 Del. Ch. LEXIS 81, at *4 (Del. Ch. Apr. 27, 2021) (finding a lodestar multiplier of 2.5x to be "on par with or less than awards this court has previously deemed reasonable"); *Fab Universal*, 148 F. Supp. 3d at 238 ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation.") (quoting *Cohn*, 375 F. Supp. 2d at 862).

In sum, a lodestar cross-check supports that the requested Fee and Expense Amount is reasonable, especially given the substantial benefits achieved in this complex litigation.

## V.   THE SERVICE AWARDS SHOULD BE APPROVED

Plaintiff respectfully requests that the Court approve Service Awards of $2,000 to each of the four Plaintiffs in recognition of the substantial benefits they helped create for the Company. *See Scovil v. FedEx Ground Package Sys., Inc.*, 2014 U.S. Dist. LEXIS 33361, at *23 (D. Me. Mar. 14, 2014) ("An incentive or service award can be appropriate to encourage or induce an individual to participate in the suit."); *Relafen*, 231 F.R.D. at 82 (approving service awards ranging from $8,000 to $14,000, recognizing that "[b]ecause a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."); *In re Compact Disc Minimum Advertised Price*

*Antitrust Litig.*, 292 F. Supp. 2d 184, 189 (D. Me. 2003) (approving service awards of $5,000 to each plaintiff); *Bezdek*, 79 F. Supp. 3d 324 (approving service awards totalling $6,500 for three plaintiffs).

The proposed Service Awards are a small fraction of the benefit secured for the Company. Because they are to be paid from the Fee and Expense Amount, they would not reduce the benefit enjoyed by the Company, and therefore are "need not be subject to intense scrutiny." *Bredbenner v. Liberty Travel, Inc*., 2011 U.S. Dist. LEXIS 38663, at *64 (D.N.J. Apr. 8, 2011). Nevertheless, Plaintiffs each participated meaningfully in the litigation, including by reviewing the litigation demands and/or complaints in their respective matters, and conferring with their counsel throughout the litigation, mediation efforts and the settlement negotiations. McKenna Decl. ¶ 66.  Moreover, the Service Awards are not disputed. Stip. § IV.4.4. Thus, the modest Service Awards should be approved.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court approve the requested Fee and Expense Amount of $2,500,000, including Service Awards of $2,000 to each of the Plaintiffs to be paid from the Fee and Expense Amount.

Dated: June 18, 2024                    Respectfully submitted,

                                        **LAW OFFICE OF MICHAEL P. UTKE, LLC**

                             By:     */s/ Michael P. Utke*
                                     Michael P. Utke
                                     P.O. Box 360
                                     Pepperell, MA 01463
                                     Telephone: (617) 314-6600
                                     Email: mutke@utkelaw.com

                                     **GAINEY McKENNA & EGLESTON**
                                     Thomas J. McKenna (admitted *pro hac vice*)
                                     Gregory M. Egleston
                                     260 Madison Avenue, 22nd Floor
                                     New York, NY 10016

Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff Val Kay***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered with the Court's CM/ECF system.

*/s/ Michael P. Utke*
Michael P. Utke